**2022 UT App 8**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BORZIN MOTTAGHIAN,
Appellant.

Opinion
No. 20200199-CA
Filed January 21, 2022

Fourth District Court, American Fork Department
The Honorable Robert C. Lunnen
No. 171101546

Ann M. Taliaferro, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
JILL M. POHLMAN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1 Borzin Mottaghian created an internet advertisement seeking women willing to participate in "paid anatomy research" for the development of "medical devices." The advertisement indicated that both anal and vaginal measurements would be taken. Two women, under the impression that Mottaghian was a medical professional engaged in legitimate medical research, eventually agreed to participate, and Mottaghian subjected both of them to anal and vaginal probes. But Mottaghian was not a medical professional and was not engaged in medical research, and the women later told police about their experience. A jury later convicted Mottaghian of various sex crimes, determining—under the totality of the circumstances—that the women had not consented to

Mottaghian's behavior. Mottaghian now appeals his convictions, asserting among other things that the State failed to establish nonconsent beyond a reasonable doubt, and that his trial attorneys rendered ineffective assistance. We affirm.

BACKGROUND[1]

¶2      In 2017, Mottaghian began pursuing an apparent desire to produce and sell sex toys, including a device that would be designed to simultaneously stimulate a woman's vagina and anus. Mottaghian's efforts in this regard were, charitably, in the nascent stages: he was not part of any company in a position to design or manufacture such devices, and he had no experience in the field. Indeed, at the time of the events giving rise to this case, Mottaghian was, by trade, the owner of two restaurants; although he was a law school graduate, he was not—and never had been—a medical doctor and had never possessed any kind of medical licensure.

¶3      Instead of utilizing data regarding anatomical sizing for sex toys that may have already existed in the marketplace, Mottaghian made the decision to try to obtain his own vaginal and anal measurement data. To gather this data, he placed an advertisement on Craigslist seeking women willing to participate in "anatomy research" for the development of new "medical devices," and promised to pay $200 in return for participation. The advertisement indicated that, as part of this "research," measurements would be taken of both the vaginal and anal areas. However, the advertisement did not mention or reference sex toys in any way. On at least one occasion, a woman

_____

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (quotation simplified).

who responded to the advertisement declined to participate once she learned that the measurements were for "adult toys."

*Kelsey*

¶4      At the time Mottaghian ran the advertisement, Kelsey[2] had recently moved back to Utah and was unemployed. To make ends meet, she was staying with various friends, living off her savings, and picking up random "jobs and gigs" from Craigslist to further support herself. During one of her searches for work on Craigslist, Kelsey stumbled upon the advertisement. There, she read that "[m]easurements are needed at the vaginal and anus areas" and that the participants would be paid a "$100 flat fee for vaginal test" and an "[e]xtra $100 flat fee for anus test." Because the advertisement mentioned "anatomy research" and "medical devices," Kelsey presumed that the measurements would be taken by a doctor in a "medical facility." Mottaghian himself confirmed this presumption by telling Kelsey in an email that the procedure would be conducted by "[t]he owner of the company" who "is the engineer and doctor." Mottaghian, however, did not identify himself in this message and instead signed the email as "Max." Responding to "Max," Kelsey scheduled an appointment. The only additional information she received prior to her appointment was an address, parking information, guidance on what to wear, and instructions to "shower [her] vaginal and anus area" prior to the appointment.

¶5      On the day of the appointment, Kelsey arrived at the designated location. There, she was greeted by a receptionist who led her to the room where the measurements were to be taken. Mottaghian opened the door to the room and showed her in, introducing himself as Borzin Mottaghian and not as "Max." When Kelsey entered the room, she noticed that "it wasn't like your typical doctor's office type of a thing"; it had a couch, desk,

---

2. A pseudonym.

and a black massage table. And unlike most medical facilities, there was no sanitary paper covering the table.

¶6 Upon questioning by Kelsey about the type of products he was creating, Mottaghian made no mention of sex toys and instead stated that he was "developing a catheter to be used on patients during surgeries," but insisted that he "couldn't give specific details" because of "trade secrets." He also stated that his company "had a warehouse" in another state that served as "their headquarters," and that he frequently ran "tests" in Utah and sent the "research back to" the "other employees" at "headquarters," where the "prototypes" were made. He then informed Kelsey that he would be taking measurements of both her vagina and anus to ensure that the products he was developing were comfortable for the patients who would be using them in surgery. After further explaining the product and procedure, Mottaghian had Kelsey sign a nondisclosure agreement and then instructed her to "disrobe from the waist down and lay on the table." Mottaghian did not leave the room while Kelsey disrobed, did not provide her with a gown, and did not cover the massage table with any form of sanitary paper before she lay down.

¶7 Mottaghian then asked Kelsey for permission to take a photograph of her vagina to keep in the company's "records." Kelsey agreed, and Mottaghian took the picture on a mobile phone. After taking the picture, he brought over a tray of instruments that he would be using to take the measurements. Mottaghian explained that after applying lubricant, he would insert metal "rods" to the point of discomfort and, when Kelsey told him to stop, he would remove the rod slightly to a bearable depth and then take the measurement from that point. Mottaghian explained that he would be taking measurements both vaginally and anally in several different positions.

¶8 Mottaghian began by using his fingers to apply lubricant to the outside of Kelsey's vagina and to the rod. He then told her he was "going to insert [the rod] in" and to let him know when it

got uncomfortable. He proceeded to insert the rod into her vagina two times, removing the rod to take the measurement when Kelsey indicated she was uncomfortable. For the next two measurements, Mottaghian changed his hand position so that his thumb was resting on her clitoris. He then performed anal measurements in a similar manner, with his hand continuing to rest on Kelsey's clitoris for the duration of the measurements.

¶9 After Mottaghian finished taking these measurements, he had Kelsey switch positions for additional measurements. He again applied lubricant to the outside of her vagina, but this time inserted his finger into her vagina and rubbed her clitoris. He stated he was doing this because she needed to "relax . . . because the measurements aren't as accurate unless you're relaxed." After he had done this for some time, Mottaghian began using the rod to measure her vagina in the new position. This time, however, instead of removing the rod between measurements, Mottaghian began moving the rod in and out of Kelsey's vagina in a manner that she perceived as similar to intercourse, telling her she was still too tense and this would help her relax. Mottaghian took three or four measurements in this position, moving the rod in and out consistently between each measurement. He also applied lubricant and inserted his fingers into her anus while rubbing her clitoris in a circular motion. He proceeded to take anal measurements, again consistently moving the rod in and out between each measurement.

¶10 Mottaghian then instructed Kelsey to return to the first position "because after all of this [she] was probably more relaxed than [she] had been in the beginning" and he could thus obtain more accurate measurements than he originally had. Mottaghian again inserted his fingers into her vagina and rubbed her clitoris; at this point, Kelsey told him that "this feels a little bit sexual in nature and I'm uncomfortable." Mottaghian responded that it was "normal to feel that way because I am inside of your sexual organs" and that "if you feel like you're going to have an orgasm, that's okay, it will help you relax, and

it wouldn't be the first time it has happened." Kelsey was surprised and "scared" by Mottaghian's dismissive answer, and thought it was far too casual to be a doctor's response. Mottaghian then took additional measurements of Kelsey's vagina, this time moving his thumb on her clitoris in a more "vigorous" manner, almost as if he were now "trying to make [her] orgasm." He also resumed inserting the rod in and out of her vagina, as he had done previously, and began inserting his fingers and making "circular motions" while maintaining contact with her clitoris. Mottaghian then followed the same routine for the final measurement of her anus: inserting his fingers, inserting the rod, and "rubbing" her clitoris.

¶11 When the procedure ended, Mottaghian gave Kelsey an envelope with $200, thanked her, and told her that when the "prototypes" arrived, she could return and test them for an additional $200. After leaving the building, Kelsey called two friends to discuss the experience she just had, and to seek advice on whether the nondisclosure agreement she had signed prevented her from reporting the incident to police. After being advised that the agreement did not prevent her from reporting the incident, Kelsey called police and, at their suggestion, went to a hospital for a sexual assault examination. Detectives then began to investigate the situation.

*Caroline*

¶12 Around the same time, Caroline[3] also responded to the advertisement and volunteered to participate. Caroline was a graduate student who occasionally visited Craigslist to search for short-term jobs. Before agreeing to participate, Caroline also engaged in an email conversation regarding the advertisement with a person identifying himself as "Max," and scheduled an appointment for the day after Kelsey's. When Caroline arrived, the receptionist took her to meet Mottaghian, who introduced

---

3. Also a pseudonym.

himself as "Max," the person she had been communicating with. He made no mention of sex toys, and instead explained that the research he was conducting was for the production of tampons and catheters, but that he could not tell her "the companies that he was working for because that was confidential." Mottaghian had Caroline sign a nondisclosure agreement, and explained that, as part of the agreement, her identity would remain private and she would be referred to only as participant number 105, a statement she interpreted as meaning that 104 other people had previously participated.

¶13 Mottaghian explained the procedure to Caroline in much the same way he had explained it to Kelsey. He told her that he would be taking her measurements in both "relaxed and neutral" positions, that she should tell him when she was in pain, and that he would remove the measuring rod slightly to take the measurement when she indicated discomfort. He also told her that he would "help [her] relax" if she needed to, though Caroline did not understand what that meant at the time. Mottaghian asked her if she had ever had vaginal or anal sex, to which she replied that she had not. He then told her that her lack of sexual experience might extend the length of the procedure and cause it to be more painful, but that it was "fine that [she] was] a virgin" because he needed "all people to participate in this."

¶14 Mottaghian instructed Caroline to disrobe from the waist down and to position herself on the table. As with Kelsey's procedure, Mottaghian did not provide Caroline with a gown or cover the table with any sort of sanitary paper, and he remained in the room while she removed her clothes. After Caroline was on the table, but before Mottaghian began the examination, he asked to take a photograph of her vagina, but she declined. Mottaghian then began inserting one of the rods into Caroline's vagina, instructing her to "tell [him] when it really hurts." While she was in pain the entire time, Caroline finally told Mottaghian to stop when the pain became "unbearable," at which point he

pulled the rod out and took a measurement. After taking vaginal measurements, he conducted the same procedure anally.

¶15    Mottaghian then told Caroline he needed to get "relaxed measurements" and, without any further explanation, inserted his fingers into her vagina and placed a finger on her clitoris. He told her he was trying to "loosen [her] up . . . because [she] was a virgin [and] was really tight and [she] needed to be looser." After removing his fingers, Mottaghian began repetitively moving the rod in and out of Caroline's vagina until she was "loose enough" for "relaxed" measurements. After taking vaginal measurements, he inserted his finger into her anus, moving it in and out; he then did the same with the rod. When Mottaghian finished inserting the rod into Caroline's anus, she was "in a lot of pain" and told Mottaghian that she needed to go to the restroom. He responded by reassuring her that they were "almost done" and if she stayed, he could "do it quickly." Caroline, however, was "adamant" about going to the restroom because "in that moment [she] didn't think [she] could keep doing it."

¶16    After Caroline arrived in the restroom, she began crying and "trying to comprehend . . . the pain." She tried to "get the courage to go back in there," not wanting to be a "quitter," and thinking of all the other women that had apparently participated before her, thinking that it was "[her] fault that it was so painful, and [she] just needed to . . . deal with it." She also reasoned that if she stopped the procedure at that point, everything she "had just gone through would be useless because they're not going to use research that's not completed." She therefore decided to return to the room and complete the study.

¶17    When Caroline returned from the restroom, Mottaghian instructed her to once again take off her pants and get back onto the table. He commented that "[she] had really tightened up and . . . that he needed to get [her] loose again." He attempted this by once again inserting his fingers and the rod into her vagina and anus. He then told Caroline "he needed to get a measurement

with both of them at the same time," and proceeded to insert rods into her vagina and anus simultaneously. Mottaghian repeatedly told her to "try to relax" and that she was "really tense," but all Caroline could do was "breathe," as "it was just really painful having both of the metal rods in."

¶18 After Mottaghian had finished inserting the rods into Caroline's vagina and anus, he instructed her to move to a different position and again inserted the rods into both her vagina and anus. He also took measurements with both rods inserted simultaneously into her vagina and anus from this position. At this point, Caroline was "in a lot of pain and . . . was shaking and crying," and she told Mottaghian she "hurt too bad and to stop." She then put her face down on the table and continued to cry, at which point Mottaghian told her she "looked more relaxed" and began inserting the rods again. For the last set of measurements, Mottaghian instructed Caroline to assume her previous position, at which point he stated she had "closed up again" and "he had to loosen [her] back up by putting them in and out and moving them around." He then informed her she "still wasn't loose enough, so he started using his hand" and "started touching [her] clitoris again." Caroline told Mottaghian that she "didn't like that," but he nonetheless continued. When he finished with the measurements, he handed her an envelope with $200 and instructed her "to go home and shower as soon as [she] can." At that point, Caroline left, and made no report to the police—at least not at that time—about the incident.

*The Undercover Officer*

¶19 The following week, Caroline received a phone call from a detective informing her that her name had come up in a criminal investigation. That same day, she spoke to detectives (the same detectives who were investigating Kelsey's claims) who informed her that Mottaghian was not a doctor; at that point, she told the detectives the details of her experience with Mottaghian. By this time, the detectives were preparing to send in an undercover officer to validate the allegations against

Mottaghian, and one of them was using Kelsey's email account to communicate with Mottaghian directly, attempting to schedule an appointment for Kelsey's fictitious roommate "Jenna." Posing as "Jenna," a detective told Mottaghian that Kelsey had told "Jenna" about the advertisement and had stated that the "measurements were done by a doctor," and asked him to confirm that this was correct and whether "Jenna" could schedule an appointment. Mottaghian responded in the affirmative to this compound question.

¶20 An undercover officer, posing as "Jenna," then went to meet Mottaghian. The officer recorded the interaction. Mottaghian explained to "Jenna" that his "clients" were "big names" that she could "see on the shelves," but that he could not "disclose" their identities, and that "there's a 90 percent chance that you actually have used one of my products." He explained that he "engineer[s] the product for them" and that "they get to say it's theirs." He then explained the procedure to her, stating that he would be taking measurements of her vagina and anus and that he would be using "surgical lubricant" as part of the process. The officer asked Mottaghian if he was the doctor or if someone else would be coming in to perform the procedure, to which Mottaghian replied, "Just me." Shortly thereafter, Mottaghian handed the officer a nondisclosure agreement to sign, and the officer stated, "All right. Let's do this." At that point, detectives who had been waiting outside the door came in, stopped the procedure, and arrested Mottaghian.

*Legal Proceedings*

¶21 After investigation, the State charged Mottaghian with twelve counts of object rape, two counts of forcible sexual assault, two counts of attempted object rape, and one count of attempted forcible sexual abuse. The State later amended the information, opting to charge Mottaghian with fewer counts: four counts of object rape (two regarding Kelsey and two regarding Caroline), two counts of forcible sexual abuse (one regarding Kelsey and one regarding Caroline), and two counts

of attempted object rape (regarding the undercover officer posing as "Jenna"). Mottaghian pled not guilty to these charges and the case proceeded to a four-day jury trial.

¶22   At trial, the State presented testimony from many witnesses, including Kelsey, Caroline, and the undercover officer—who testified about the events described above—and several other law enforcement officers, who testified about their investigation into Mottaghian's actions.

¶23   The State also elicited testimony from Mottaghian's close friend and business partner (Friend), who had begun to help Mottaghian—starting just days before the appointments with Kelsey and Caroline—design a logo and create a website for a new "company." When Friend asked Mottaghian what the new company was for, Mottaghian sent him a picture of a vagina (which the State alleged was the one he took of Kelsey) and told him that he was planning to sell sex toys. Mottaghian also told Friend that he was conducting "research" that he claimed he needed in order to develop original sex toys for sale on the website. Mottaghian also texted Friend—after the incident with Caroline—that he had "just finished with a virgin Mormon girl" and, in response to a question about whether the participant was "comfortable," stated that his "techniques sooth[e] them." In response to this message, and after learning more about the "research" Mottaghian was conducting, Friend recommended that Mottaghian stop the appointments, telling him that, from an "outside perspective," his "research" looked "weird." Friend suggested that, if Mottaghian was intent on producing sex toys, he should use already-existing measurement data.

¶24   The State also presented testimony from Mottaghian's ex-wife, who had been married to Mottaghian at the time of the events in question. She testified that after Mottaghian's arrest, she saw him create a "diagram of a . . . tampon" and then backdate it to make it appear as if it had been created before the appointments with Kelsey and Caroline. She testified that she

gave that diagram to an attorney she had hired to defend Mottaghian.

¶25   Mottaghian defended the case primarily by asserting that Kelsey and Caroline had volunteered to participate in activity that they knew would involve vaginal and anal probes, and that the State had therefore failed to prove that they had not consented to the events. Because his defense primarily centered around consent, Mottaghian did not contest that Kelsey and Caroline had been subjected to vaginal and anal probes and—because Mottaghian elected not to testify in his own defense—no witness contradicted Kelsey's and Caroline's accounts of the penetrations and touches that occurred in the examination room.

¶26   At the close of the State's case, Mottaghian moved for a directed verdict on all counts. With regard to the six counts involving Kelsey and Caroline, Mottaghian argued that the State had presented insufficient evidence to prove nonconsent, asserting that the "two complaining witnesses did in fact get what they signed up for, knowingly." And with regard to the two counts involving the undercover officer, Mottaghian argued that the State had not proved that he had taken a "substantial step" toward commission of the crime, as required by the attempt statute. The trial court denied these motions, concluding that the State had presented sufficient evidence on both contested issues.

¶27   In his defense, Mottaghian called two witnesses: a business associate, who testified that Mottaghian had in fact spoken to him about developing tampons and catheters, in addition to adult sex toys, and one of his prior attorneys, who testified briefly that he had never been given the backdated diagram, as Mottaghian's ex-wife had testified. Mottaghian also vigorously cross-examined Kelsey and Caroline, attempting to establish that they had in fact consented.

¶28   In particular, while cross-examining Caroline on the second day of trial, Mottaghian's attorneys attempted to cast

doubt on her testimony that she had cried during the procedure and at one point had told Mottaghian to stop. To make this point, counsel asked Caroline to admit that, in her various police interviews, she had made no mention of crying or of telling Mottaghian to stop, and that she had mentioned those details for the first time during her trial testimony. On redirect, the State attempted to show that Caroline had in fact mentioned those details to police in various text messages, but it soon became apparent that the messages themselves had not been disclosed to defense counsel prior to trial, even though some of them had been described in detail in one of the disclosed police reports.

¶29 Mottaghian's counsel then moved for a mistrial, claiming that the State had either "destroyed or did not keep" the text messages, and that counsel themselves had been ineffective for not noticing the reference to the text messages in the police report. The court called for a recess to consider the motion. During the recess, the State was able to obtain copies of the text messages from Caroline, and provided them to defense counsel. After the recess, Mottaghian's attorneys announced that, after "consulting with each other" during the break, they wanted to "cure [the problem] [them]selves through the examination process" by cross-examining both Caroline and the detective about the newly produced text messages. The next day, Mottaghian's attorneys reiterated that they had resolved to wait for the detective to testify and then, if there was still an "issue," they would renew the motion for a mistrial, but if they perceived no outstanding issue at that juncture, they would simply withdraw the motion. Mottaghian's counsel was allowed to cross-examine both Caroline and the detective about the text messages, and never renewed the motion for a mistrial.

¶30 After all the evidence was presented, the trial court instructed the jury. The court gave the jurors a general unanimity instruction stating that their "verdict must be unanimous." But no party asked for, and the court did not give, any further instruction on unanimity. With regard to consent, the court gave an instruction very similar to the Model Utah Jury

Instruction regarding consent. *See* Model Utah Jury Instructions 2d CR1615 (2020), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=44#1615 [https://perma.cc/SPK9-QJCC]. In that instruction, the court told the jurors that the State had the burden to prove that Caroline and Kelsey "did not consent to the alleged sexual conduct." The instruction contained a list of "[e]xamples of lack of consent," which included several scenarios set forth in Utah Code section 76-5-406, but it also contained a catch-all provision stating that jurors could find nonconsent in "[a]ny other circumstances where [they] find a lack of consent when considering the common, ordinary meaning of consent."

¶31 After deliberation, the jury found Mottaghian guilty as charged on all counts regarding Kelsey—two counts of object rape and one count of forcible sexual abuse—and on the forcible sexual abuse count involving Caroline. On the other four counts, the jury found Mottaghian guilty of lesser-included offenses: sexual battery (instead of object rape) on the two other counts involving Caroline, and attempted sexual battery (instead of attempted object rape) on the two counts involving the undercover officer. The court later sentenced Mottaghian to prison on all counts, with the sentences on the two object rape counts to run concurrently, but the sentences on all other counts to run consecutively to the object rape counts.

ISSUES AND STANDARDS OF REVIEW

¶32 Mottaghian now appeals and presents two main issues. First, he argues that the State presented insufficient evidence, in various particulars, to support a conviction on any of the counts charged. As part of this argument, he asserts that the trial court erred when it denied his motions for a directed verdict. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Carrick*, 2020 UT App 18, ¶ 22, 458 P.3d 1167 (quotation simplified). "In reviewing the denial of a motion for directed verdict based on a claim of insufficiency of the

evidence, we will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified).

¶33   Second, Mottaghian asserts that his trial attorneys, in various ways, rendered ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

ANALYSIS

I

¶34   Mottaghian argues that the State presented insufficient evidence to support his convictions on all counts, and claims that the trial court erred—in two main ways—when it denied his various motions for a directed verdict. First, with regard to the six counts relating to Caroline and Kelsey, Mottaghian asserts that the State failed to establish a lack of consent beyond a reasonable doubt. Second, with regard to the two counts relating to the undercover officer, he asserts that he did not take a "substantial step" toward commission of the crime, as required by the attempt statute. We address these arguments in turn.

A

¶35   Mottaghian   first   argues   that   the   State   presented insufficient evidence to support a determination that Kelsey and Caroline did not consent to Mottaghian's various penetrations and touches. Specifically, Mottaghian argues that, because both Kelsey and Caroline knew that vaginal and anal measurements

were to be taken as part of the "research," they consented to all of Mottaghian's actions, and that no reasonable jury could have concluded otherwise. We disagree.

¶36    The governing statute regarding consent provides that a sexual act "is without consent of the victim under any of the following circumstances," and then lists twelve specific situations, including instances where "the victim expresses lack of consent through words or conduct," where "the actor overcomes the victim through . . . physical force or violence," and where "the victim is younger than 14 years of age." *See* Utah Code Ann. § 76-5-406(1), (2), (9) (LexisNexis 2017).[4] Some of the listed circumstances describe situations in which deceptive conduct on the part of the actor may be at issue.[5] *See id.* § 76-5-

---

4. Because the incidents giving rise to this case occurred in 2017, we cite the statute then in effect. The statute has since been amended, but not in any way material to this case.

5. One important piece of the State's theory at trial was that Mottaghian had, through misrepresentations and false statements, deceived Kelsey and Caroline into participating in the activity, and that had Kelsey and Caroline known the truth about Mottaghian's purposes and business situation, they would not have agreed to participate. Mottaghian attacks this theory on appeal, referring to it as a "fraud-in-the-inducement" theory of nonconsent and asserting that such a theory "is not cognizable as a matter of law." Mottaghian posits that puffery is common on the dating scene, and that people—in an effort to initiate sexual relationships—often "exaggerate[] how much money [they] make, or pretend[] to be interested in a long-term relationship," and argues that a person who falls for such puffery cannot reasonably later claim rape due to nonconsent. But "consent . . . is a fact-intensive, context-dependent question, decided on a case-by-case basis." *State v. Barela*, 2015 UT 22, ¶ 39, 349 P.3d 676. Whether, and to what extent, the actor deceived the victim into participation in sexual acts is one factor a factfinder may

(continued…)

406(7) (stating that consent is not present when "the actor knows that the victim submits or participates because the victim erroneously believes that the actor is the victim's spouse"). Indeed, one of the circumstances describes situations in which

> the actor is a health professional or religious counselor, . . . the act is committed under the guise of providing professional diagnosis, counseling, or treatment, and at the time of the act the victim reasonably believed that the act was for medically or professionally appropriate diagnosis, counseling, or treatment to the extent that resistance by the victim could not reasonably be expected to have been manifested.

*Id.* § 76-5-406(12). Under the statute, "health professional" was defined as "an individual who is licensed or who holds himself or herself out to be licensed" as a medical professional. *See id.* § 76-5-406(12)(a).

---

(…continued)
consider in determining whether, under the totality of the circumstances, consent was present. Indeed, two of the twelve scenarios listed in the statute describe situations that may involve deceptive practices. *See* Utah Code Ann. § 76-5-406(7), (12) (LexisNexis 2017). We therefore reject Mottaghian's contention that a "fraud-in-the-inducement" theory of nonconsent is never cognizable, although we recognize that there may be cases in which an actor's misrepresentations are not significant enough to constitute the sort of deception that would vitiate consent. In this case, as discussed herein, Mottaghian's misrepresentations and deceptions were significant enough such that a reasonable jury could have determined that neither Kelsey nor Caroline consented to Mottaghian's behavior.

¶37    This statute, though, does not purport to comprehensively "define nonconsent." *State v. Barela*, 2015 UT 22, ¶ 38, 349 P.3d 676; *see also id.* ¶ 40 ("The statute nowhere prescribes any definition of nonconsent."). Instead, it "merely limits the various theories of consent that might otherwise be available" by preventing "the factfinder from deeming sex to be consensual in circumstances deemed substantively out of bounds as a matter of public policy." *Id.* ¶ 38 (quotation simplified). The reason the statute does not comprehensively define nonconsent is because consent, as a general rule, "is a fact-intensive, context-dependent question," to be "decided on a case-by-case basis." *Id.* ¶ 39. Thus,

> to determine whether a victim has truly consented, the factfinder must pay close attention to the verbal and nonverbal cues given by the victim and to a wide range of other elements of context. These and other contextual nuances are the reason why, as a general rule, our law has long left the matter of consent in the hands of the jury.

*Id.* (quotation simplified); *see also State v. Thompson*, 2014 UT App 14, ¶ 90, 318 P.3d 1221 (stating that, in deciding whether consent was present during a particular incident, a jury is free to "consider whether the totality of the evidence supports a finding of lack of consent under its common, ordinary meaning"). The consent statute is therefore "best understood as prescribing exceptions to the general rule"—that consent is a fact-intensive question to be decided on the circumstances of each case—and "deeming certain circumstances beyond the case-by-case discretion of the factfinder." *Barela*, 2015 UT 22, ¶ 40. Indeed, we have stated that the consent statute "sets out a list of circumstances under which there is deemed to be no consent to sexual activity as a matter of law but does not preclude the fact-finder from determining that circumstances outside those defined in the statute may still amount to lack of consent in any particular case." *Thompson*, 2014 UT App 14, ¶ 90 (quotation simplified).

¶38    Utah's model jury instruction on this topic encapsulates these concepts. It states that "alleged sexual conduct is without consent . . . under any, all, or a combination of the following circumstances," and then lists the twelve situations enumerated in the statute. *See* Model Utah Jury Instructions 2d CR1615. After setting forth each of the twelve statutory situations, the model instruction ends by stating as follows: "In deciding lack of consent, you are not limited to the circumstances listed above. You may also apply the common, ordinary meaning of consent to all of the facts and circumstances of this case." *Id.*

¶39    The consent instruction that the trial court gave to the jury in this case was very similar to the model instruction. The trial court reviewed the case law, and indicated that it wanted to give a consent instruction informing jurors that "they can use any other common, ordinary meaning that they believe establishes lack of consent." Defense counsel assured the court that the model instruction already contained that admonition, and that Mottaghian was asking the court to give a consent instruction that was similar to the model instruction. The court then gave the requested instruction, and Mottaghian makes no argument, here on appeal, that the instruction was inaccurate or improper.

¶40    In that instruction, the court stated that the State bore the burden of proving, beyond a reasonable doubt, that Kelsey and Caroline "did not consent to the alleged sexual conduct." The instruction then listed six of the twelve circumstances set forth in the consent statute, including the scenario involving a deceptive health professional, and stated that those were "examples of lack of consent." The court also instructed the jury that it could find "lack of consent" in "[a]ny other circumstances where you find a lack of consent when considering the common, ordinary meaning of consent."

¶41    In evaluating Mottaghian's sufficiency-of-the-evidence challenge, we must keep these legal principles in mind. The question is not necessarily whether the facts of this case fit within one of the twelve scenarios enumerated in the consent

statute. Of course, if the facts *do* fit one of those scenarios, then consent is not present. But even if the facts do not perfectly fit any of the listed scenarios, a jury may still potentially find, after considering all the evidence, that consent was not present. The overarching question is "whether the totality of the evidence supports a finding of lack of consent under its common, ordinary meaning." *See Thompson*, 2014 UT App 14, ¶ 90.

¶42 Here, the State presented evidence at trial sufficient to create a question for the jury on the issue of nonconsent. In the advertisement, Mottaghian solicited volunteers to participate in "paid anatomy research" for the development of "medical devices." He was, however, not involved in any attempt to develop medical devices. When Kelsey inquired about who would be performing the procedure, Mottaghian falsely told her that "[t]he owner of the company" who "is the engineer and doctor" would be the one doing so. He also gave the misleading impression that he worked for a legitimate research company, and falsely told Kelsey that the large company he worked for had its headquarters, as well as a warehouse, in another state. And in explaining the procedure, Mottaghian told Kelsey and Caroline, respectively (and falsely), that he was "developing a catheter to be used on patients during surgeries" and that the research he was conducting was for the production of tampons and catheters. Both Kelsey and Caroline testified that they would not have participated in the research had they known it was for the development of sex toys.[6]

---

6. In addition to asserting that the State failed to prove nonconsent, Mottaghian also argues—for the first time on appeal—that the State failed to prove that he "acted with the required mental state" regarding consent. Recognizing that this argument is unpreserved, Mottaghian asks us to review this issue through the lens of plain error and ineffective assistance of counsel. In particular, he asserts that his trial attorneys were ineffective for not moving for a directed verdict on this issue,

(continued…)

¶43   This evidence was sufficient to create a jury question regarding both (a) whether the "deceptive health professional" scenario listed in the consent statute applied here, and (b) whether, even if none of the scenarios applied perfectly, under the totality of the circumstances Kelsey and Caroline consented to the sexual activity. A reasonable jury, after hearing the evidence presented, could have concluded that Mottaghian was falsely holding himself out as a "health professional" and that this activity occurred "under the guise of providing professional

---

(…continued)
and that the trial court committed plain error by submitting the case to the jury on this issue. We find both of these arguments unpersuasive. For the reasons just stated, the State presented sufficient evidence of nonconsent, including testimony indicating that Mottaghian deceived Caroline and Kelsey into participating in the research and that he knew he was being dishonest in his explanation of what he was doing and why. That same evidence was also sufficient to allow a reasonable jury to conclude that Mottaghian was at least reckless about whether Kelsey and Caroline actually consented. *See* Utah Code Ann. § 76-5-402.2 (LexisNexis 2017) (listing no mens rea for nonconsent as to the crime of object rape); *id.* § 76-5-404 (listing no mens rea for nonconsent as to the crime of forcible sexual abuse); *id.* § 76-2-102 (stating that "when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility"). Thus, any motion for a directed verdict on that point would have been futile, and therefore counsel did not render ineffective assistance by electing not to bring such a motion. *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 ("The failure of counsel to make motions that would be futile if raised does not constitute ineffective assistance." (quotation simplified)). And for similar reasons, the trial court did not commit any error—let alone an obvious one—by failing to direct a verdict on that point.

diagnosis, counseling, or treatment." *See* Utah Code Ann. § 76-5-406(12) (LexisNexis 2017). But even if the jurors found that particular example of nonconsent to be inapplicable, they could reasonably have determined, in this situation, that neither Kelsey nor Caroline consented to the activity under the "common, ordinary meaning" of consent. *See Thompson*, 2014 UT App 14, ¶ 90. In this situation, the trial court did not err when it denied Mottaghian's motion for a directed verdict on Counts 1–6.

B

¶44    Mottaghian next argues that—with respect to the counts involving the undercover officer—the State presented insufficient evidence to prove that he took a "substantial step" toward committing the crime of attempted sexual battery, and that the trial court therefore erred when it denied his motion for a directed verdict on those counts. We disagree.

¶45    A person commits the crime of sexual battery "if the person . . . intentionally touches, whether or not through clothing, the anus, buttocks, or any part of the genitals of another person, or the breast of a female person, and the actor's conduct is under circumstances the actor knows or should know will likely cause affront or alarm to the person touched." Utah Code Ann. § 76-9-702.1(1) (LexisNexis 2017). And a person is guilty of "an attempt to commit a crime" when that person "intends to commit the crime" and "engages in conduct constituting a substantial step toward commission of the crime." *Id.* § 76-4-101(1)(a), (1)(b)(i). Thus, to obtain a conviction on the charge of attempted sexual battery, the State had to prove beyond a reasonable doubt that Mottaghian intended to "touch . . . the anus, buttocks, or any part of the genitals" of the undercover officer, that such conduct would "likely cause affront or alarm" to the officer, and that Mottaghian "engage[d] in conduct constituting a substantial step" toward commission of that crime. Mottaghian's directed verdict motion was limited to the third item in that list: he asserted that the State failed to

adequately prove that he took a "substantial step" toward commission of the crime.

¶46 Our legislature has explained that "conduct constitutes a substantial step if it strongly corroborates the actor's mental state." *Id.* § 76-4-101(2). Our supreme court, interpreting this statute, has explained that a substantial step requires "significant conduct" in the form of an "overt act." *State v. Arave*, 2011 UT 84, ¶ 30, 268 P.3d 163 (quotation simplified). That act must be "something more than mere preparation"; it must be "a tangible step toward commission of a crime that transcends intent, yet fails to culminate in its planned accomplishment." *Id.* (quotation simplified); *see also State v. Hoffman*, 2021 UT App 143, ¶ 20.

¶47 Here, the undercover officer told Mottaghian that she was interested in participating in the same medical research procedures that Kelsey had participated in—procedures that by definition included taking "measurements" of her anus and vagina. Mottaghian scheduled an appointment for her to participate in those procedures. When she arrived at the appointment, Mottaghian explained the procedures to her, stating that he would be taking measurements of her anus and vagina and that he would be using "surgical lubricant" as part of the process. The officer then asked Mottaghian if he was the doctor or if someone else would be coming in to perform the procedure, to which Mottaghian replied, "Just me." Shortly thereafter, Mottaghian handed the undercover officer a nondisclosure agreement to sign, and the officer stated, "All right. Let's do this." At that point, the process was interrupted by other police officers waiting outside the door.

¶48 In our view, these actions easily qualify as a "substantial step" toward commission of the relevant crime. Mottaghian's actions were significant, and constitute more than mere solicitation or preparation. A person who posts an advertisement, schedules an appointment, explains to the person that he is about to penetrate her anus and vagina and take measurements, and hands her a nondisclosure agreement to sign

has taken tangible overt actions that strongly indicate intent to commit the crime. Mottaghian was ready and prepared to begin the procedure when the officer said, "Let's do this." Indeed, at that point, it was only a question of whether the officer was going to actually disrobe and allow him to take the measurements. Mottaghian was interrupted only by the intrusion from the other police officers. These actions clearly indicate an intent to commit the crime of sexual battery and constitute a "tangible step toward commission" of that crime. *See Arave*, 2011 UT 84, ¶ 30.

¶49 Thus, the State presented sufficient evidence from which a jury could find, beyond a reasonable doubt, that Mottaghian took a substantial step toward commission of the charged attempt crimes. Accordingly, the trial court did not err by denying Mottaghian's motion for a directed verdict on those counts.

II

¶50 Next, Mottaghian argues that his trial attorneys rendered constitutionally ineffective assistance. To establish that his attorneys were ineffective, Mottaghian must show both (1) that his attorneys' performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. "A defendant must satisfy both parts of this test in order to successfully establish ineffective assistance." *State v. Whytock*, 2020 UT App 107, ¶ 26, 469 P.3d 1150. Thus, "it is unnecessary for a court to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one." *Id.* (quotation simplified).

¶51 The first part of the test requires Mottaghian to show that his attorneys' performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See id.* ¶ 35 ("[T]he performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶52 If Mottaghian establishes that his trial attorneys rendered deficient performance, he must next show that he was prejudiced by that performance. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *Whytock*, 2020 UT App 107, ¶ 28. "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. And in assessing whether this standard is met, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified). A defendant attempting to show that there was a "reasonable probability of a different outcome" faces "a relatively high hurdle to overcome." *Id.* ¶ 44.

¶53 In the present case, Mottaghian asserts that his trial attorneys rendered ineffective assistance in three distinct ways. First, he argues that his attorneys were ineffective by failing to object to the absence of a specific instruction regarding jury unanimity. Second, he argues that his attorneys were ineffective for failing to ascertain the State's theory of nonconsent prior to

trial. And third, he argues that his attorneys were ineffective for failing to renew a motion for a mistrial based on alleged discovery violations made by the State. We address each of Mottaghian's arguments, in turn.

A

¶54　In his first ineffective assistance claim, Mottaghian raises a jury unanimity issue. In particular, Mottaghian argues that, because the State chose to charge him with only eight crimes but put on evidence of some fifty-eight different touches or penetrations, it was potentially unclear which touch or penetration supported each count. Mottaghian correctly points out that the jury was not given a specific (as opposed to a general) unanimity instruction, and asserts that it is therefore unknown whether all the jurors unanimously agreed to convict Mottaghian for the same actions. He therefore asserts that his attorneys rendered ineffective assistance by not requesting a specific unanimity instruction.[7]

¶55　Our state constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. "At its

---

7. Because Mottaghian's attorneys did not ask the trial court to give a specific unanimity instruction, this issue is not preserved for appellate review, and Mottaghian invites us to consider it through the lens of both plain error and ineffective assistance of counsel. Because the prejudice analysis is the same for plain error as it is for ineffective assistance of counsel, our conclusion (discussed in text, *infra* ¶¶ 59–72) that Mottaghian cannot demonstrate prejudice for the purposes of his ineffective assistance claim also means that Mottaghian cannot demonstrate prejudice for the purposes of his plain error claim. *See, e.g., State v. Martinez*, 2021 UT App 11, ¶¶ 44–46, 480 P.3d 1103 (stating that "plain error and ineffective assistance of counsel share a common standard of prejudice," and concluding that, where prejudice is lacking, both claims fail (quotation simplified)).

most basic level, this provision requires the full concurrence of all empaneled jurors on their judgment as to the criminal charges submitted for their consideration." *State v. Hummel*, 2017 UT 19, ¶ 25, 393 P.3d 314. Additionally, it is "well-established" that our constitutional unanimity requirement "'is not met if a jury unanimously finds only that a defendant is guilty of a crime.'" *See id.* ¶¶ 26, 30 (emphasis omitted) (quoting *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951). Our constitution "requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." *Id.* ¶ 26 (emphasis omitted). Indeed, "a generic 'guilty' verdict that does not differentiate among various charges would fall short," as would "a verdict of 'guilty of some crime.'" *Id.* ¶¶ 26–27. For example,

> a verdict would not "be valid if some jurors found a defendant guilty of robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery."

*Id.* ¶ 28 (quoting *Saunders*, 1999 UT 59, ¶ 60). "These are distinct counts or separate instances of the crime of robbery, which would have to be charged as such." *Id.*

¶56 In *State v. Alires*, 2019 UT App 206, 455 P.3d 636, this court held that a jury verdict violated constitutional unanimity principles where a defendant was charged with "six identically-worded counts" of sexual abuse, the counts were not distinguished by act or by alleged victim, the victims described more than six acts that could have qualified as abuse, and the jury convicted the defendant on only two counts. *See id.* ¶¶ 22–23. In that situation, "the jurors could have completely disagreed on which acts occurred or which acts were illegal," even if they all agreed that abuse had occurred at some point. *Id.* ¶ 23.

¶57    In this case, while the trial court instructed the jurors that their "verdict must be unanimous," the jurors were not specifically instructed that they had to agree on each element of each count, including the specific criminal act—here, the specific touch or penetration—that formed the basis for each conviction. We agree with Mottaghian that this was problematic, and that under the law as it existed at the time of trial, the jury instructions were deficient in this respect.[8]

¶58    This problem could have been alleviated, however, if the State had identified for the jury—in closing argument, for instance—"which act supported each charge." *See id.* ¶ 22; *see*

---

8. In its brief, the State points out that *Alires* was issued three days after the trial in this case ended, and asserts that, until *Alires*, there was no clear requirement that the jury had to be unanimous as to which specific act supported each count, and that at the time of trial "the only clear requirement about the content of unanimity instructions was that the jury had to be instructed that its verdict had to be unanimous." We disagree, and note our supreme court's discussion in *State v. Hummel*, where the court concluded that the principles discussed above, *see supra* ¶ 55, were "well-established in our law." *See* 2017 UT 19, ¶ 30, 393 P.3d 314; *see also State v. Evans*, 2001 UT 22, ¶ 17, 20 P.3d 888 (referring to the court's holding in *State v. Saunders* as a "majority" view). In *Alires*, we were not plowing entirely new ground. Even before that case came out, both counsel and the trial court should have been aware of *Hummel* and other jury unanimity case precedents. *See State v. Baugh*, 2022 UT App 3, ¶ 14 n.3 (stating that, even though *Alires* was not published "until a few days after" the relevant trial, "if the law was well enough established at the time *Alires* was tried, such that the *Alires* court could determine that counsel there performed deficiently in failing to request a proper unanimity instruction, the law was also well enough established that defense counsel here should have recognized the need to request appropriate unanimity instructions").

*also State v. Santos-Vega*, 321 P.3d 1, 18 (Kan. 2014) (stating that, to remedy a jury unanimity problem, "either the State must have informed the jury which act to rely upon for each charge . . . or the [trial] court must have instructed the jury to agree on the specific criminal act for each charge"), *quoted with approval in Alires*, 2019 UT App 206, ¶ 22; *State v. Paule*, 2021 UT App 120, ¶ 48 (holding that prosecutors had taken steps "to obviate any jury unanimity problem" when they "clearly identified for the jury which factual circumstance formed the basis for [the] obstruction of justice charge"), *petition for cert. filed*, Jan. 10, 2022 (No. 20220039). But the State did not take any such steps in this case. Thus, the deficiency that existed with the jury instructions went unaddressed, and was not resolved through any action taken by the State.

¶59 But even assuming, for purposes of our analysis, that Mottaghian's attorneys performed deficiently by failing to object to the absence of a specific unanimity instruction, Mottaghian's ineffective assistance claim can succeed only if he can demonstrate that the problem with the jury instructions mattered: that is, that there existed a reasonable probability of a different outcome had the jury been provided a specific unanimity instruction. And on that score, we agree with the State's position that Mottaghian has failed to demonstrate prejudice.

¶60 In support of his argument that the absence of a specific unanimity instruction prejudiced him, Mottaghian asserts that "the sheer number of touches at issue and other surrounding circumstances make it likely that different jurors could easily reach different conclusions as to which acts were done in conjunction with the other requisite elements of the charged offenses." In particular, Mottaghian argues that specificity—especially as to which act supported each charge for Kelsey and Caroline—was important here because, even assuming that the two women initially had not consented to Mottaghian's actions, there was a distinguishing point during each woman's appointment where she apparently realized that Mottaghian

may not be what he claimed to be but nevertheless made a conscious choice to continue with the procedure. For Kelsey, Mottaghian claims this point occurred after she told him that "this feels a little bit sexual in nature" and came to the realization that the appointment was "no longer" for research, but still chose to continue. For Caroline, Mottaghian asserts that this point occurred when she left the room to use the restroom but then returned to finish the appointment. We acknowledge Mottaghian's point that there could conceivably be a difference, when it comes to consent, between the touches and penetrations that occurred prior to these realization points and the touches and penetrations that occurred after. But we remain unpersuaded by Mottaghian's overall prejudice argument, for several reasons.

¶61    First, the testimony regarding whether, when, and how the touches and penetrations occurred, as recounted by Kelsey and Caroline, went uncontested by any other witness. Indeed, Mottaghian defended the case not by asserting that some or all of the touches did not occur but, instead, by asserting that all of them were consensual. Mottaghian acknowledges, in his brief, that Kelsey and Caroline each testified to many anal and vaginal penetrations, and many clitoral touches, *prior to* any realization that Mottaghian's operation might not be legitimate. Thus, in terms of *actus reus*, there can be no question, on this record, that Mottaghian committed more touches *prior to* any point of realization than there were charges against him.

¶62    Second, the facts of this case—at least with regard to whether Mottaghian was prejudiced by the lack of a specific jury unanimity instruction—are more like *State v. Percival*, 2020 UT App 75, 464 P.3d 1184, and *State v. Case*, 2020 UT App 81, 467 P.3d 893, than they are like *Alires* and *State v. Baugh*, 2022 UT App 3. In *Percival*, the defendant was involved in an altercation at a party that resulted in the stabbing of four victims. *See* 2020 UT App 75, ¶¶ 2–11. Eventually, the defendant was charged with one count of attempted murder (for the most serious injuries sustained by one of the victims) and one count—and not

three—of aggravated assault (for the stab wounds inflicted on the remaining three victims). *Id.* ¶ 14. At the close of the evidence, the trial court instructed jurors that they could find the defendant guilty on the single aggravated assault charge only if they found, among other things, that the defendant had "caused bodily injury to [victim 2] OR [victim 3] OR [victim 4]." *Id.* ¶ 17. The defendant was found guilty and appealed his assault conviction, arguing that the jury may not have been unanimous regarding which victim formed the basis for the aggravated assault verdict. *Id.* ¶ 24. On appeal, we noted that "the evidence overwhelmingly established that [the three assault victims] were all stabbed during the fracas and that [the defendant] was the sole person wielding a knife," and that on this record there existed "no reasonable likelihood that the jury would not have agreed on any one victim on" the assault charge. *Id.* ¶ 29. Thus, we ultimately concluded that, "[b]ecause of the overwhelming evidence that [the defendant] stabbed [all three victims], it is unlikely that the jury would have acquitted [the defendant] on [the assault charge] had it been asked to agree on a single victim," and that therefore the defendant had not been prejudiced by the lack of further guidance on the assault charge. *Id.* ¶¶ 33–34.

¶63 In *Case*, police investigators discovered thirty-seven images of child pornography on the defendant's computers, but charged him with only seven counts of sexual exploitation of a minor. *See* 2020 UT App 81, ¶ 5. The defendant did not contest the State's assertion that all thirty-seven images constituted child pornography. *Id.* ¶¶ 10–13. At trial, the court did not instruct the jury that it had to unanimously agree on which pictures formed the basis for each count. *Id.* ¶ 22. Thus, "the jury was left with the task to identify and unanimously agree on seven specific acts of sexual exploitation of a minor from among the thirty-seven images that were identified as child pornography." *Id.* After being convicted on all seven counts, the defendant appealed, arguing that the trial court committed plain error by not giving a specific unanimity instruction. *Id.* ¶ 21. On appeal, we noted that

> [e]ven if the jurors had been instructed that they each had to agree on which seven images satisfied each specific count set forth in the amended information, because the jury found that the State had proved beyond a reasonable doubt that [the defendant] possessed and viewed child pornography, there is little doubt the jury would have selected the seven most sexually graphic depictions of child pornography among the thirty-seven that were admitted into evidence . . . resulting in the same seven convictions for [the defendant].

*Id.* ¶ 26. Thus, we ultimately concluded that the defendant had "not shown a reasonable likelihood of a different result at trial even though the court erred in instructing the jury as to unanimity." *Id.*

¶64 The situation was different, however, in *Alires* and *Baugh*. In *Alires*, as already noted, there were two different victims, and several different touches—more than six in total—were perpetrated on each victim, even though the defendant was charged with only six counts. *See* 2019 UT App 206, ¶¶ 22–23. The defendant testified at trial and denied any inappropriate touches, and was ultimately convicted on only two of the "six identically-worded counts." *Id.* Under those circumstances, concerns about jury unanimity were heightened because it was unclear which two touches the jury had found occurred, or even whether all the jurors had agreed on any particular touch. *Id.* ¶ 23. We stated that, on that record, it was possible for the jurors to have "completely disagreed on which acts occurred or which acts were illegal," and was therefore possible that the jury had rendered a non-unanimous verdict. *Id.*

¶65 In *Baugh*, the defendant was charged "with two counts of aggravated sexual abuse of a child: one count for abuse that allegedly occurred in 2012 and one count for abuse that allegedly

occurred in 2014." *See* 2022 UT App 3, ¶ 6. At trial, the defendant testified and maintained that no abuse had occurred at all, and was ultimately acquitted on the abuse count from 2012, but was convicted on the abuse count from 2014. *See id.* ¶¶ 7, 10. On appeal, we noted that because the victim testified to three instances of abuse—two that occurred at a family house and one that occurred at an apartment—and because the defendant lived at both the family house and the apartment in 2014, "we cannot know if the jury agreed that the conviction for count two, the 2014 count, was for one of the two alleged acts of abuse in the family house or the alleged act of abuse in the apartment." *Id.* ¶ 21. We therefore concluded that the defendant's trial counsel had performed deficiently by failing to request a specific unanimity instruction stating that the jury had to agree on a specific instance of abuse for each count. *Id.* ¶¶ 13–19. We also concluded that this deficient performance prejudiced the defendant because "under these circumstances our confidence in the outcome [had] been undermined." *Id.* ¶ 26.

¶66 In our view, the present circumstances are more similar to *Percival* and *Case* than they are to *Alires* and *Baugh*. Taken together, these cases support the proposition that, when the defendant does not dispute that the relevant acts (e.g., stabbings, or the existence of child pornography on a computer) occurred, and there is no meaningful and relevant basis upon which to distinguish the various acts underlying the charges, the absence of a jury unanimity instruction ultimately does not prejudice the defendant because the jury would have had no difficulty in unanimously agreeing that any one of the relevant criminal acts supported the charges. And on the facts of this case, there are enough uncontested pre-realization touches to satisfy all of the charged counts, and there is no meaningful consent-related basis to distinguish between those touches; at a minimum, Mottaghian offers no basis upon which a juror might have considered some of the pre-realization touches consensual and others not. Under these circumstances, we do not perceive a reasonable probability that the jury would have reached a different result had it been specifically instructed that all jurors needed to agree on the

specific act underlying each count. To illustrate, we engage in a count-by-count analysis.

¶67    *Counts 1-3: Kelsey.* Mottaghian was charged with three counts related to Kelsey: two counts of object rape (potentially, one for anal penetration and one for vaginal penetration, although the State never expressly argued it this way) and one count of forcible sexual abuse (apparently, for a non-penetrative touch). For the object rape counts, the State had to prove beyond a reasonable doubt that, among other things, Mottaghian—without Kelsey's consent—caused "the penetration . . . of [Kelsey's] genital or anal opening . . . by any foreign object, substance, instrument, or device, . . . with the intent to arouse or gratify the sexual desire of any person." *See* Utah Code Ann. § 76-5-402.2 (LexisNexis 2017). And the State had to prove that at least two penetrations (whether anal or vaginal) satisfied the elements of this crime. For the forcible sexual abuse count, the State had to prove that Mottaghian—without Kelsey's consent— touched her "anus, buttocks or any part of [her] genitals . . . with the intent to arouse or gratify the sexual desire of any person." *Id.* § 76-5-404. By Mottaghian's own count (as set forth in his briefing), Kelsey testified that Mottaghian committed at least fifteen vaginal penetrations, eight anal penetrations, and nine genital touches, the majority of which—and at least two of each type—occurred prior to any alleged realization point. The jury convicted Mottaghian on all three of these counts as charged.

¶68    As already mentioned, no witness testified at trial to contradict Kelsey's account of the touches and penetrations, and Mottaghian defended the case not by suggesting that the touches and penetrations did not occur but, instead, by suggesting that they were consensual. And by its verdict, the jury found that Kelsey did not consent to at least two penetrations and at least one genital touch. The verdict could, of course, reflect a finding that *all* the touches and penetrations were nonconsensual. But even assuming that is not the case, and even taking Mottaghian's argument about the realization point at face value and

presuming that the jury believed that the post-realization touches were all consensual, the jury must in that event have based its verdict on pre-realization touches. And because there are more of those touches than there are counts, and because there is no meaningful way to distinguish between the various pre-realization touches from a consent standpoint, we cannot agree with Mottaghian's argument that there exists a reasonable probability of a different result had the jury been given a specific unanimity instruction. As in *Percival*, we perceive no reasonable probability that—even with a proper unanimity instruction—the jury would have failed to unanimously agree on at least one nonconsensual contact of each type to form the basis for these three counts. *See* 2020 UT App 75, ¶¶ 29, 33–34; *see also Case*, 2020 UT App 81, ¶ 26.

¶69    *Counts 4-5: Sexual Battery of Caroline.* Mottaghian was charged with two counts of object rape in relation to Caroline. The jury acquitted Mottaghian on these charges and instead found him guilty on two counts of the lesser-included offense of sexual battery. For that crime, the jury had to find that Mottaghian "intentionally touche[d]" Caroline's "anus, buttocks, or any part of [her] genitals," and that Mottaghian's "conduct [was] under circumstances [he] knows or should know [would] likely cause affront or alarm" to Caroline. *See* Utah Code Ann. § 76-9-702.1 (LexisNexis 2017). Notably, nonconsent is not an element of this crime. *See id.* Thus, even assuming that Caroline's mid-procedure visit to the restroom created an issue about her consent, the jury apparently resolved any such issue in Mottaghian's favor by acquitting him of the more serious charges—the ones that required findings of nonconsent—and convicting him of lesser offenses that did not require nonconsent. Here, we see no reasonable likelihood that a more specific jury unanimity instruction would have resulted in a different outcome on these counts. *See Percival*, 2020 UT App 75, ¶ 29.

¶70    *Count 6: Forcible Sexual Abuse of Caroline.* Mottaghian was also charged with one count of forcible sexual abuse in relation

to Caroline. For this count, as already mentioned, the State had to prove that Mottaghian—without Caroline's consent—touched her "anus, buttocks or any part of [her] genitals . . . with the intent to arouse or gratify the sexual desire of any person." Utah Code Ann. § 76-5-404. The jury convicted Mottaghian on this count as charged. Our analysis on this count tracks our analysis on Count 3, the forcible sexual abuse count against Kelsey. No witness testified at trial to contradict Caroline's account of the relevant touches, and Mottaghian defended the case not by disputing Caroline's account of the touches but, instead, by asserting that they were consensual. And by its verdict, the jury found that Caroline did not consent to at least one non-penetrative genital touch. Even assuming that the jurors did not agree that *all* the genital touches were nonconsensual, and even assuming that Caroline's restroom visit rendered all post-restroom touches consensual, there are still more pre-restroom genital touches than there are counts, and Mottaghian offers us no meaningful way to distinguish between the various pre-restroom touches from a consent standpoint. For these reasons, we cannot agree with Mottaghian's argument that there exists a reasonable probability of a different result on this count had the jury been given a specific unanimity instruction. *See Percival*, 2020 UT App 75, ¶ 29.

¶71    *Counts 7-8: The Undercover Officer*. Mottaghian was charged with two counts of attempted object rape in relation to the undercover officer. The jury acquitted Mottaghian of attempted object rape, but found him guilty, on both counts, of the lesser-included offense of attempted sexual battery. For that crime, the State had to prove that Mottaghian attempted to "intentionally touch[]" the undercover officer's "anus, buttocks, or any part of [her] genitals," and that Mottaghian's "conduct [was] under circumstances [he] knows or should know [would] likely cause affront or alarm" to the officer. *See* Utah Code Ann. § 76-9-702.1. Here, the officer had agreed to undergo the same procedure as Kelsey and Caroline, including measurements of both the vagina and anus, and was thus going to be measured at least once in each location. And because the activity was

interrupted by police officers before any actual touching occurred, the analysis on these counts does not require us to consider whether there are grounds upon which to differentiate any touches. By finding Mottaghian guilty of attempted sexual battery on these counts, the jury clearly believed that Mottaghian was about to touch the officer inappropriately before he was interrupted. In this situation, and with regard to these counts, a specific unanimity instruction would not have made any difference at all, and therefore Mottaghian has not demonstrated a reasonable likelihood of a different result had such an instruction been given.

¶72 Accordingly, even assuming that Mottaghian's trial attorneys performed deficiently by not requesting a specific jury unanimity instruction, Mottaghian's ineffective assistance claim fails for lack of prejudice. On the facts of this case, we perceive no reasonable likelihood that Mottaghian would have obtained a more favorable result had such an instruction been given.

B

¶73 In his second ineffective assistance claim, Mottaghian argues that his trial attorneys rendered ineffective assistance by not doing enough to ascertain, at an early enough point in the process, the State's "theory of nonconsent." Specifically, Mottaghian argues that his attorneys' "missed opportunities and subsequent failures to obtain or require notice of the State's nonconsent theory forced [him] to face trial by surprise." We are unpersuaded by this argument.

¶74 As previously mentioned, "consent—or nonconsent, to put it in terms of an element of a crime—is a fact-intensive, context-dependent question, decided on a case-by-case basis." *State v. Barela*, 2015 UT 22, ¶ 39, 349 P.3d 676. In most situations, that question is best left "in the hands of the jury." *Id.* Indeed, in deciding whether consent was present during a particular incident, a jury is free to "consider whether the totality of the evidence supports a finding of lack of consent

under its common, ordinary meaning." *State v. Thompson*, 2014 UT App 14, ¶ 90, 318 P.3d 1221. These principles were clearly established at the time of Mottaghian's trial. And Mottaghian does not claim that he was unaware of any of the facts underlying the State's theory of the case. The State's theory, in this case, amounted to nothing more or less than this: under the specific and rather unique facts presented here, neither Kelsey nor Caroline consented to the sexual activity committed by Mottaghian.

¶75 Under these circumstances, we cannot say that it was objectively unreasonable for Mottaghian's trial attorneys to not demand further information from the State regarding its theory of nonconsent. The question of whether consent exists, in any given case, is fact-dependent, and Mottaghian was well aware of the facts surrounding the incidents in question. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 (stating that "the ultimate question" of whether counsel performed deficiently is whether counsel's actions were "objectively reasonable").

¶76 And for the same reasons, Mottaghian has not shown that his trial attorneys' failure to ascertain the State's theory of nonconsent prejudiced him. Again, his attorneys were well acquainted with the facts surrounding the incidents, and they knew that the State was arguing that those particular facts did not amount to consent. Thus, there was no reasonable probability of a more favorable outcome for Mottaghian at trial, even if his attorneys had demanded further information, because his attorneys already knew what the State's theory of nonconsent was. *See State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150 ("Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently."). Mottaghian has thus failed to prove that his attorneys rendered ineffective assistance in this regard.

C

¶77 In his final ineffective assistance claim, Mottaghian argues that his attorneys rendered ineffective assistance by failing to renew their motion for a mistrial regarding alleged discovery violations—related to text messages between Caroline and the police—committed by the State.[9] We disagree, because Mottaghian has not demonstrated that his attorneys performed deficiently in this regard.

¶78 As discussed above, to prove that his attorneys rendered ineffective assistance, Mottaghian must first show that their performance was deficient, in that it "fell below an objective standard of reasonableness." *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Importantly, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

¶79 In this instance, Mottaghian's attorneys had a reasonable strategic basis for electing not to renew the motion for a mistrial. Indeed, after receiving copies of the text messages on the second day of trial and carefully considering the matter, Mottaghian's attorneys decided to "cure [the problem them]selves through the

_____

9. In his brief, Mottaghian initially frames this claim by stating that the trial court erred in denying his motion for a mistrial based on this issue. But as previously noted, *see supra* ¶¶ 28–29, the court did not deny Mottaghian's motion for a mistrial because Mottaghian's counsel elected not to renew it after receiving copies of the text messages and cross-examining both Caroline and the relevant detective about them. Thus, the trial court was never given an opportunity to rule on the motion. Accordingly, we will therefore review this issue through the lens of ineffective assistance of counsel, per Mottaghian's (alternative) request.

examination process." And they then proceeded to execute this strategy by cross-examining both Caroline and the relevant detective regarding the contents of the text messages. This strategy appears reasonable to us under the circumstances, and we cannot say, on these facts, that it was objectively unreasonable for Mottaghian's trial attorneys to have proceeded as they did. Thus, Mottaghian has failed to demonstrate that his attorneys rendered ineffective assistance with regard to the motion for a mistrial. *See Whytock*, 2020 UT App 107, ¶ 26 (stating that "[a] defendant must satisfy both parts of [the] test in order to successfully establish ineffective assistance" and that it is thus "unnecessary for a court to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one" (quotation simplified)).

## CONCLUSION

¶80    The State presented sufficient evidence to present a jury question on all eight of the charged counts. In particular, a reasonable jury could find, based on these facts, that Kelsey and Caroline did not consent to Mottaghian's actions, and that Mottaghian took a substantial step toward commission of the charged attempt crimes. Thus, the trial court did not err when it denied Mottaghian's motions for a directed verdict. And Mottaghian has failed to demonstrate that his trial attorneys rendered constitutionally ineffective assistance. Accordingly, we affirm Mottaghian's convictions.

————