**2022 UT App 101**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MELECIO GARCIA-LORENZO,
Appellant.

Opinion
No. 20200369-CA
Filed August 18, 2022

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 181900321

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and William M. Hains,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

HARRIS, Judge:

¶1     A jury found Melecio Garcia-Lorenzo guilty of sexually abusing his eight-year-old stepdaughter (Child). Garcia-Lorenzo now appeals his convictions, asserting among other things that his trial attorney provided ineffective assistance by failing to seek a jury instruction that specifically directed the jurors that they needed to unanimously agree upon which acts formed the basis for each criminal charge. We find merit in Garcia-Lorenzo's arguments, and therefore reverse his convictions and remand for a new trial.

BACKGROUND[1]

¶2      Garcia-Lorenzo lived with his wife (Mother), their two biological children, and Child, who is Mother's daughter from a previous relationship. Two of Garcia-Lorenzo's brothers also lived in the family home. The brothers each had their own room, Garcia-Lorenzo and Mother shared a room where their youngest child also slept, and Child shared a room with her younger half-sister. Mother typically kept the girls' room locked because one of the brothers had a girlfriend whom she did not particularly trust.

¶3      On the morning of December 31, 2017, Mother woke up and began looking for Garcia-Lorenzo. The couple had planned to go to the grocery store that morning to buy food and materials needed for a New Year's Eve dinner; they had family and friends coming over to the house that evening to celebrate the new year. After she did not find him in their bedroom, Mother went to Child's room to see if her daughters were awake. But when she attempted to open Child's bedroom door, she discovered that it was locked, so she went back to her bedroom to get the key. When Mother opened the locked door, she found Garcia-Lorenzo on the bed with the two girls, lying close behind Child. Garcia-Lorenzo and Child were covered by a blanket and, when Mother entered the room, Garcia-Lorenzo "pushed the blanket between" himself and Child, and Mother could see Child attempting to pull up her pajama pants underneath the blanket. Mother went to the bed, pulled the blankets off, and saw that Child's pajama bottoms were still halfway off, with one leg out.

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (quotation simplified).

¶4      Garcia-Lorenzo then "jumped out of bed and slammed the door shut." Mother demanded to know what was going on, and Garcia-Lorenzo replied that he "didn't do nothing" and "wouldn't do that." He pulled his pants away from his waist and invited Mother to feel his penis, asserting that he would have an erection if he had been doing anything sexual to Child. Mother declined, but "could tell" that he did not have an erection. She then spoke with Child about what had happened. Child appeared "scared and worried," and told Mother that Garcia-Lorenzo had put his "thing in [her] butt."

¶5      At that point, Mother began trying to think "of a plan of how to get out of there safely with all three of [her] kids." Mother did not work outside the home and was dependent on Garcia-Lorenzo for money; she did not have family in Utah and was not sure where they could go. According to her testimony at trial, Mother did not show any affection toward Garcia-Lorenzo for the rest of that day and evening, although she tried to keep up appearances and act like nothing had happened in an effort to keep from ruining the holiday celebration.

¶6      Some of the other people at the house that day remembered things a bit differently. One of Garcia-Lorenzo's brothers testified that everyone was happy at the party, including Mother, who expressed several times how much she loved Garcia-Lorenzo. Another witness testified that Mother sat on Garcia-Lorenzo's lap and acted "normal" during the party. And one brother's ex-girlfriend testified that she heard "noises" coming from Mother and Garcia-Lorenzo's bedroom after the party that night. She testified that the noises were mostly coming "from a woman," and that it sounded like "someone was moaning." She was prepared to testify that the moans sounded pleasurable rather than painful, like the two were having sex, but the State objected, on foundation grounds, to the admission of that lay opinion testimony, and the court sustained the objection.

¶7     Over the next few days, Mother continued to mull over the situation. On January 4, she told Garcia-Lorenzo's nephew's girlfriend about what had happened on New Year's Eve morning; in response, the nephew's girlfriend told Mother about a nearby women's shelter and suggested she might consider going there. Later that same day, Mother acted on this suggestion, and went to the shelter with all three children.

¶8     After arriving at the shelter, Mother called the police and told them what had happened on New Year's Eve. Officers then went to Garcia-Lorenzo's house to arrest him. They found him at the house, and he was cooperative with police as they took him into custody.

¶9     After Mother moved into the shelter, a police detective interviewed Child. No recording of this interview was played for the jury at trial; instead, the detective who conducted the interview testified about it, with the assistance of a transcript. As recounted by the detective, Child stated during the interview that Garcia-Lorenzo came into her bedroom, took his pants off, and took her pants off. After that, Mother came in and "was very mad." The detective then told Child that he had spoken with Mother, who had mentioned that somebody "possibly had put something in [Child's] butt." Child responded by stating that "Dad put his thing in my butt." She told the detective that it hurt, and when asked to clarify what "his thing" meant, Child "pointed to her crotch area." The detective asked Child if Garcia-Lorenzo had touched any other body part, and Child said "no." She later stated, however, that Garcia-Lorenzo "had not actually put his thing in her butt on that day," presumably referring to the New Year's Eve day when Mother had walked into the room, but instead had "put his thing in [her] butt" on a different occasion, when the family lived in a different house.

¶10     A few days after the interview, Mother took Child to the hospital for examination. Mother told the examiner that Garcia-

Lorenzo had touched Child's "front and back with his thing," and that Child had been having nightmares and some unusual behavioral issues, as well as some "pink-tinged kind of discharge in her underwear." The examiner found no injuries requiring treatment, later explaining at trial that it is "very uncommon" to see injuries from child sexual abuse because the anal and genital areas are "made to expand" and tend to heal quickly.

¶11 The State eventually charged Garcia-Lorenzo with one count of sodomy on a child and one count of aggravated sexual abuse of a child, both first-degree felonies. In the charging document, the State alleged that the instance of sodomy had occurred sometime between September 1, 2017 and December 31, 2017, and that the instance of aggravated sexual abuse occurred "on or about" December 31, 2017. But the document did not otherwise specify which touch corresponded with which count.

¶12 The case proceeded to a first jury trial, which ended in a mistrial after a concern about one of the jurors arose on the morning of the trial's second day. Before the mistrial was declared, however, the State had already put on most of its case, including calling as witnesses both Child and Mother. Notably, however, the State did not call—and did not even list as a potential witness—any expert to testify regarding techniques for interviewing child witnesses. During the first trial, Garcia-Lorenzo's defense counsel cross-examined Child and was able to elicit some favorable evidence by asking leading questions. For instance, during cross-examination, Child testified that she had previously told Garcia-Lorenzo that Mother had told her what to say, and that if she didn't say what Mother wanted her to, she would get into trouble.

¶13 The case was later rescheduled for a second trial. At that trial, which took place in May 2019, the State again called Child, Mother, and several other of the same witnesses it had called at the first trial, but this time the State also called an expert to testify

about techniques that should be used when conducting forensic interviews of child witnesses. This witness testified that a proper forensic interview with a child should be "unbiased or open-ended" and should allow "children to talk about things that have happened in their own words." And after the expert stated that a forensic interviewer should be "non-leading, non-suggestive, [and] very open-ended," the prosecutor began to ask a follow-up question about "leading questions," but Garcia-Lorenzo's attorney objected, arguing at a sidebar conference that the State was attempting to "discredit [his] cross-examination," and pointing out that, in conducting his cross-examination, he "wasn't doing a forensic interview" and that therefore the expert's testimony "doesn't help the fact finder in any way." Despite the objection, the court allowed to State to continue its examination, and the expert concluded by testifying that "the best question types" are "non-leading" and that "open-ended questions typically yield more accurate results [and] more accurate details."

¶14    During her testimony at the second trial, Child testified that, on New Year's Eve, Mother "came in the room and then saw [Garcia-Lorenzo] in the bed with [her]." The State asked what Garcia-Lorenzo was doing in her bed, and Child responded, "He was taking off my clothes." After Child testified that Garcia-Lorenzo had pulled off her underwear and her pants, the State asked whether Garcia-Lorenzo had touched any particular part of her body, and Child answered that he had touched "the back part" with "his thing." Using an anatomical drawing, Child indicated that Garcia-Lorenzo touched her that morning with his penis "on" both her vagina and her anus. She also testified that Garcia-Lorenzo had "put his thing in her butt" on New Year's Eve. The State also inquired as to whether Garcia-Lorenzo had ever "put his thing in your bottom part" on another occasion "before at a different house," and Child responded that he had, but she did not remember when. At this point, defense counsel objected and asked the State to stop asking leading questions on direct. The court responded, "So, there's some leading going on.

And I do appreciate that it's a child witness. But let's see if you can do it without that."

¶15    In cross-examining Child, defense counsel—as he had done in the first trial—asked many leading questions. Eventually, the State lodged an objection, explaining during a sidebar conference that defense counsel was "doing so much leading, which is bad with children, that [Child] doesn't have a chance to say she doesn't remember everything she said." Defense counsel responded, "I get to lead. It's cross examination." The court overruled the State's objection. Later during cross-examination, Child acknowledged that she had been telling the truth when, during the first trial, she testified that Mother had told her what to say and that "if [she] didn't say what [Mother] had told [her] to say, that [she] would get in trouble."

¶16    After the evidence was presented, defense counsel made a motion for a directed verdict regarding count 2, the aggravated sexual abuse charge. Outside the presence of the jury, counsel acknowledged that Child had testified that Garcia-Lorenzo had "put his thing inside of her buttocks," and that there was therefore sufficient evidence to "go to the jury" on count 1, the sodomy charge. But counsel asserted that Child had "never testified that he did any other act that would give rise to aggravated sexual abuse," and that "the testimony has all been about one incident." In response, the State asserted that Child had testified not only that Garcia-Lorenzo had "put his thing in [her] butt that morning," but also, "as part of that," had asserted that Garcia-Lorenzo had "touched her front private parts." In addition, the State referenced Child's claim that "this happened previously, that he put his thing in her butt at the house that they previously lived in," an event the State characterized as "a separate incident of sodomy." The court denied Garcia-Lorenzo's motion.

¶17    Soon thereafter, the court read to the jury a stipulated set of instructions. While the instructions informed the jury that its

decision had to be unanimous, they did not tell the jury that it needed to agree on the specific act that formed the basis for each charge. In an earlier set of instructions given at the beginning of trial, the court had read to the jury the charging document, which alleged that sodomy occurred "on or about September 1, 2017 through December 31, 2017," and that aggravated sexual abuse occurred "on or about December 31, 2017."

¶18 During its closing argument, the State began by discussing the sodomy charge, and appeared to make some effort to tie that count to the events that took place prior to New Year's Eve in the other house. But the State also implied that the same act that occurred in the old house prior to New Year's Eve—sodomy— had occurred again in the new house on New Year's Eve; in particular, the State asked the jury to "find the defendant guilty" on the sodomy count due to Child's testimony "that after the date in which her mother discovered what was happening, she said that this happened before. And she told you that this happened before when they lived in the other house." The prosecutor had mentioned something similar in her opening statement as well, relaying Child's statement to Mother that Garcia-Lorenzo had "put his thing in [her] butt," and highlighting that Child had "talked to [Mother] about the fact that this had happened before in a home that they lived in previous[] to" New Year's Eve.

¶19 With regard to the other count—the one for aggravated sexual abuse—the State appeared to try to tie that count to Child's testimony that, on New Year's Eve, during "that last event," Garcia-Lorenzo "did touch [Child's] genitals and did touch her buttocks." But as noted, the State also argued that Garcia-Lorenzo had also committed sodomy on New Year's Eve.

¶20 When it was his turn to make closing argument, defense counsel suggested that Child had accused Garcia-Lorenzo of sexual abuse because Child felt pressure from Mother to make accusations, arguing that "we all know if you keep pressing a

child, 'Did he do this? Did this happen? Did this happen' a child will eventually . . . tell you what you want to hear just so that you leave them alone." In response to this argument from the defense, the State—during rebuttal—argued as follows:

> If you want to see a good example of pressuring a child to say something, you can look to some things that happened here in the courtroom . . . Where was [Child] pressured? On cross-examination. Dozens and dozens and dozens of leading questions.

Defense counsel objected to this argument, taking issue (at a sidebar) with the State "implying that" asking leading questions on cross-examination was "improper." The court asked the State if it was "planning on going any further with that" and, when the prosecutor replied in the negative, the court overruled the objection. Soon thereafter, however, the prosecutor returned to the argument that she had told the court she would not make, stating that "on cross-exam [defense counsel] said to [Child], 'But you never told that to anybody before, right? Right?' So [Child] says 'Yeah' and went along with the leading." And later, she argued that "what happened here was [Child] succumbed to that pressure" on cross-examination. Defense counsel did not renew his objection following these additional comments.

¶21 Following deliberation, the jury convicted Garcia-Lorenzo on both counts. Later, Garcia-Lorenzo filed a motion for a new trial, asserting that the State—by calling the forensic interview expert to discuss techniques for interviewing children and by suggesting during closing argument that defense counsel's leading questions to Child had been improper—had committed prosecutorial misconduct. The court denied the motion, offering its view that, after defense counsel objected to the prosecutor's statement about "leading questions," the State ceased that line of argument," and concluding that the jury was therefore not "improperly influenced" by the State's tactics.

ISSUES AND STANDARDS OF REVIEW

¶22    Garcia-Lorenzo now appeals, arguing that multiple trial errors—both individually and cumulatively—warrant reversal. First, Garcia-Lorenzo contends that defense counsel rendered constitutionally ineffective assistance by failing to seek specific jury unanimity instructions. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

¶23    Second, Garcia-Lorenzo asserts that the trial court failed to appropriately remedy prosecutorial misconduct related to statements made during the State's closing argument. We review "a trial court's handling of claimed prosecutorial misconduct for an abuse of discretion." *State v. Clark*, 2014 UT App 56, ¶ 10, 322 P.3d 761 (quotation simplified).

¶24    Finally, Garcia-Lorenzo challenges the trial court's decision to exclude lay testimony, from Garcia-Lorenzo's brother's ex-girlfriend, that it sounded like Garcia-Lorenzo and Mother were engaging in sexual activity after the New Year's Eve party. We review a trial court's evidentiary rulings for abuse of discretion. *State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032.

ANALYSIS

I.  Ineffective Assistance of Counsel

¶25    Garcia-Lorenzo's first contention is that his attorney rendered constitutionally ineffective assistance. To establish that his attorney was ineffective, Garcia-Lorenzo must show both (1) that his attorney's performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that this

deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. "A defendant must satisfy both parts of this test in order to successfully establish ineffective assistance." *State v. Whytock*, 2020 UT App 107, ¶ 26, 469 P.3d 1150.

¶26　The first part of the test requires Garcia-Lorenzo to show that his attorney's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took could have been motivated by trial strategy. *See id.* ¶ 35 ("[T]he performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶27　If Garcia-Lorenzo establishes that his attorney rendered deficient performance, he must next show that he was prejudiced by that performance. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *Whytock*, 2020 UT App 107, ¶ 28. "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. And in assessing whether this standard is met, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have

been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified).

¶28 In this case, Garcia-Lorenzo asserts that his trial attorney rendered ineffective assistance by failing to lodge two particular objections to the instructions the court gave the jury.[2] First, he asserts that counsel failed to object to the absence of an instruction that told the jury it must unanimously agree on the specific act that formed the basis for each charge. Second, and relatedly, he notes that Child's testimony that he "touched her anus with his penis" could potentially have satisfied the elements of both sodomy and aggravated sexual abuse, and he therefore asserts that counsel should have "request[ed] an instruction distinguishing the two separate charges" as well as one that "told the jury that the two convictions had to be for different acts."

¶29 Although Garcia-Lorenzo frames these as separate issues, they are quite closely related. They arise out of a concern that the State charged him with only two crimes, but put on evidence of four physical acts that could potentially have amounted to criminal behavior: (1) Child's allegations, made during the police interview (as described by the detective) and during her testimony at trial, that Garcia-Lorenzo had "put his thing in [her] butt" prior to New Year's Eve, in the old house; (2) Child's allegations, made during her trial testimony and recounted by Mother's trial testimony, that he had "put his thing in her butt" on New Year's Eve; (3) Child's trial testimony that Garcia-Lorenzo had touched her "on" her buttocks or anus with his penis on New Year's Eve; and (4) Child's trial testimony that Garcia-Lorenzo had touched her "on" her vagina with his penis on New Year's Eve. Garcia-Lorenzo points out that, under these circumstances,

---

2. In the alternative, Garcia-Lorenzo asserts that the trial court committed plain error by not including additional instructions. But because we resolve Garcia-Lorenzo's ineffective assistance claim in his favor, we need not consider his plain error claim.

various problems can arise, such as a conviction despite a lack of jury unanimity (for instance, if four jurors think he committed sodomy at the old house, and four think he committed sodomy on New Year's Eve, but there is no unanimity with regard to either act) or multiple convictions for the same act (for instance, if the jurors think he put his penis in Child's anus on New Year's Eve, but do not believe he committed the other acts, and nevertheless convict him of both sodomy and aggravated sexual abuse).

¶30    We begin our analysis with an overview of the legal principles that govern Garcia-Lorenzo's challenge, and we conclude that, under current governing law, Garcia-Lorenzo has demonstrated that his attorney performed deficiently. We then address—and decline—the State's request that we at least partially overrule one of our cases in this area. And finally, we address whether the attorney's deficient performance prejudiced Garcia-Lorenzo.

A

¶31    Our state constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. "At its most basic level, this provision requires the full concurrence of all empaneled jurors on their judgment as to the criminal charges submitted for their consideration." *State v. Hummel*, 2017 UT 19, ¶ 25, 393 P.3d 314. Additionally, it is "well-established" that our constitutional unanimity requirement "'is not met if a jury unanimously finds only that a defendant is guilty of a crime.'" *See id.* ¶¶ 26, 30 (emphasis omitted) (quoting *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951). Our constitution "requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." *Id.* ¶ 26 (emphasis omitted). Indeed, "a generic 'guilty' verdict that does not differentiate among various charges would fall short," as would "a verdict of 'guilty of some crime.'" *Id.* ¶¶ 26–27. For example,

a verdict would not "be valid if some jurors found a defendant guilty of robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery."

*Id*. ¶ 28 (quoting *Saunders*, 1999 UT 59, ¶ 60). "These are distinct counts or separate instances of the crime of robbery, which would have to be charged as such." *Id.*

¶32     In December 2019—some seven months after the second trial in this case—we issued our opinion in *State v. Alires*, 2019 UT App 206, 455 P.3d 636. In that case, the defendant was charged with "six identically-worded counts" of aggravated sexual abuse, the counts were not distinguished by act or by alleged victim, the complaining witnesses described more than six acts that could have qualified as abuse, and the jury convicted the defendant on only two counts. *See id.* ¶¶ 22–23. In that situation, "the jurors could have completely disagreed on which acts occurred or which acts were illegal," even if they all agreed that abuse had occurred at some point. *Id.* ¶ 23. Although the court gave the jury a general instruction that its verdict needed to be unanimous, *id.* ¶ 23 n.5, it did not "instruct the jury that it must be unanimous as to the specific act underlying each count of conviction," *id.* ¶ 12. To the contrary, the prosecutor told the jury, during closing argument, that "any one of [the] touchings qualifies for each of the counts" and that "[i]t can be any combination." *Id.* ¶ 11. On these facts, this court rendered two notable holdings.

¶33     First, we held that the jury should have been given a specific—and not just a general—unanimity instruction, stating that "the jury should have been instructed to agree on a specific criminal act for each charge in order to convict." *Id.* ¶ 22. The court further noted that, "[w]here neither the charges nor the elements

instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *Id.* ¶ 23.

¶34     Second, we determined that, under the state of the law at the time of trial, "it should have been readily apparent" to the defendant's attorney that applicable law "required the court to instruct the jury that it must agree on the specific criminal act for each charge in order to convict." *Id.* ¶¶ 24–25; *see also id.* ¶ 19 (stating that the constitutional jury unanimity requirement is "well-established in our law" and that "this requirement was applied in the closely analogous *Saunders* case in 1999"). Thus, the court held that the defendant's attorney had rendered deficient performance by failing to ask the court for a specific unanimity instruction. *See id.* ¶ 17 ("Under the circumstances of this case, it was objectively unreasonable for trial counsel to propose instructions that did not require the jury to be unanimous as to the specific acts supporting each count of conviction.").

¶35     Garcia-Lorenzo asserts that *Alires* controls here and compels the conclusion that his attorney performed deficiently by failing to request a more specific instruction regarding jury unanimity. We agree.

¶36     As it did in *Alires*, the State in this case put on evidence of more potentially criminal touches (four) than there were charges against Garcia-Lorenzo (two). By doing so, the State set up a situation in which it was possible for jurors to "have completely disagreed on which acts occurred or which acts were illegal," even if they all agreed that abuse had occurred at some point. *See id.* ¶ 23; *see also State v. Baugh*, 2022 UT App 3, ¶ 21, 504 P.3d 171, (stating, in a similar case, that it was "therefore entirely possible that some (but not all) of the jurors convicted on count two based on the belief that the alleged abuse occurred at the family house, while some other (but not all) jurors convicted based on the belief that the abuse occurred at the apartment"), *cert. granted*, July 11,

2022 (No. 20220272). And as in *Alires*, the court gave the jury a general unanimity instruction, but did not "instruct the jury that it must be unanimous as to the specific act underlying each count of conviction." *See Alires*, 2019 UT App 206, ¶ 12. Under the circumstances presented here, the jury should have been instructed that it needed to unanimously agree on the specific act underlying each count of conviction. *Id.*; *accord Baugh*, 2022 UT App 3, ¶¶ 17–19.

¶37 And the chronology of this case is very similar to the chronology in *Alires*. In that case, the trial, by definition, took place prior to the issuance of our *Alires* opinion. *See generally Alires*, 2019 UT App 206. Assessing the state of the case law prior to *Alires*, we held in that case that trial counsel acted unreasonably by not requesting a specific unanimity instruction. *See id.* ¶¶ 17, 25 ("Had trial counsel properly investigated the governing law, it would have been apparent that *Saunders* required the court to instruct the jury that it must agree on the specific criminal act for each charge in order to convict."). Likewise, the trial in this case occurred in May 2019, before our opinion in *Alires* was issued, and under the same legal landscape that governed counsel's actions in the *Alires* trial. Thus, *Alires* controls here, and dictates the conclusion that Garcia-Lorenzo's attorney performed deficiently by not requesting a specific jury unanimity instruction.

¶38 The State attempts to distinguish *Alires* on two grounds, neither of which we find persuasive. First, it asserts that *Alires* is different because, in that case, the prosecutor affirmatively told the jury that it could convict based on any of the various touches in "any combination." *See id.* ¶ 11. We agree that this statement by the prosecutor in *Alires* was ill-advised and probably made the problem worse. But the problem existed with or without the comment by the prosecutor: the jury needed to be instructed, either way, that it had to unanimously agree on the specific criminal act underlying each count of conviction. And since *Alires*, we have specifically so held, even in cases in which the prosecutor

made no affirmative comment. *See, e.g., State v. Mottaghian*, 2022 UT App 8, ¶¶ 54, 57, 504 P.3d 773 (concluding that "the jury instructions were deficient" in a case where the State charged the defendant with "only eight crimes but put on evidence of some fifty-eight different touches" and where no specific unanimity instruction was given; the State made no affirmative statement that unanimity was unnecessary); *State v. Whytock*, 2020 UT App 107, ¶ 34, 469 P.3d 1150 (concluding that "a jury unanimity problem existed" when the jury was presented with two potential criminal acts and only one charge, and the jury was not provided with a specific unanimity instruction; the State made no affirmative statement that unanimity was unnecessary).

¶39   Second, the State asserts that, in closing argument, the prosecutor made an "election" to instruct the jury which touch went with each count, which it contends "obviated any need for" a specific jury unanimity instruction. The State is correct that jury unanimity problems can sometimes be alleviated if the State carefully identifies for the jury, in closing argument or elsewhere, "which act supported each charge." *See Alires*, 2019 UT App 206, ¶ 22. But in cases like this one, where the asserted "cure" occurs during closing argument, any such contention goes only to prejudice, not to deficient performance; indeed, the jury had already been instructed by the time closing argument rolled around. Garcia-Lorenzo's attorney had already performed deficiently by failing to request a specific unanimity instruction, and he could not—as a matter of chronology—have based his decision not to seek a specific jury unanimity instruction on a statement that the prosecutor had not yet made. We discuss later, *infra* ¶¶ 51–53, whether the State really did sufficiently alleviate the jury unanimity problem in its closing argument. But even if it did, defense counsel still performed deficiently by not requesting a specific unanimity instruction.

¶40   Thus, *Alires* is materially indistinguishable from this case and—unless and until we disavow it, or our supreme court tells

us otherwise—it controls the outcome here. Under the rule set out in *Alires*, the jury should have been given a specific unanimity instruction, and Garcia-Lorenzo's attorney performed deficiently by not requesting one.

B

¶41 The State, however, asks us to partially overrule *Alires*. In particular, the State does not ask us to disavow *Alires*'s first holding—that "[w]here neither the charges nor the elements instructions link each count to a particular act," a general unanimity instruction is not enough, and that "instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *See Alires*, 2019 UT App 206, ¶ 23. But the State does ask us to overrule *Alires*'s second holding—that the law was clear enough on that point prior to *Alires* such that "it should have been readily apparent" to reasonable attorneys that a specific unanimity instruction was required. *See id.* ¶ 24. For the reasons discussed, we decline the State's invitation to partially overrule *Alires*.

¶42 The principle of stare decisis dictates that "the first decision by a court on a particular question of law governs later decisions by the same court." *See State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993); *see also Stare Decisis*, Black's Law Dictionary (11th ed. 2019) (defining "stare decisis" as the principle that "a court must follow earlier judicial decisions when the same points arise again in litigation"). This doctrine "is a cornerstone of Anglo-American jurisprudence because it is crucial to the predictability of the law and the fairness of adjudication." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 (quotation simplified). And "because stare decisis is so important to the predictability and fairness of a common law system, we do not overrule our precedents lightly." *Id.* (quotation simplified); *see also Thurman*, 846 P.2d at 1269 (stating that "no judicial system could do society's work if it eyed

each issue afresh in every case that raised it" (quotation simplified)).

¶43    This is especially true for a court like ours, in which we hear cases in rotating panels of three judges, and not every judge participates in every case. It simply will not do to have one panel of this court overruling precedent from another panel merely due to disagreement over the outcome of the case. *See State v. Legg*, 2018 UT 12, ¶ 9, 417 P.3d 592 (stating that "one panel on the court of appeals owes great deference to the precedent established by a different panel on the court of appeals"); *Thurman*, 846 P.2d at 1269 ("It is one thing to admit that differences among judges on a particular legal question can exist; it is quite another to sanction variability in the rule of law depending solely on which of several judges of an appellate court sit on a given case.").

¶44    Certainly, courts do retain the power to overrule precedent in appropriate cases; in particular, this court has the power to overrule its own precedent, and we have done so on rare occasions. *See, e.g., In re B.T.B.*, 2018 UT App 157, ¶¶ 39–44, 436 P.3d 206, *aff'd*, 2020 UT 60, 472 P.3d 827; *State v. Legg*, 2016 UT App 168, ¶¶ 26–42, 380 P.3d 360, *aff'd*, 2018 UT 12, 417 P.3d 592. But we do not do so lightly, and we recognize that, in our system, it is our supreme court—and not another panel of this court—that has the primary role when it comes to reviewing the propriety of opinions rendered by particular panels of this court. *Cf.* Utah Code Ann. § 78A-4-102(2) (LexisNexis 2018) ("The Court of Appeals may not sit en banc.").

¶45    Before we may overrule one of our precedents, we must engage in the two-part exercise required by our supreme court in such situations. First, we must assess the correctness of the precedent, and specifically examine "the persuasiveness of the authority and reasoning on which the precedent was originally based." *See Eldridge*, 2015 UT 21, ¶ 22. Second, we must assess the practical effect of the precedent, including considerations such as

"the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *See id.* Our supreme court has treated this as a two-part test, both parts of which must be satisfied in order for us to overrule a precedent. *See In re Discipline of Bowen*, 2021 UT 53, ¶ 84 n.20, 500 P.3d 788 (stating that, where "one of the *Eldridge* factors is not met, we need not discuss the other"). In this case, our conclusion that the State cannot satisfy the second *Eldridge* element is dispositive, and we therefore need not discuss the first.

¶46     We acknowledge the State's point that *Alires* was decided in December 2019, less than three years ago, and that it therefore does not qualify as an especially ancient precedent. *See Eldridge*, 2015 UT 21, ¶ 34 (stating that "newer precedents are likely to be less firmly established"). But unlike other cases in which we have overruled precedent, *see Legg*, 2016 UT App 168, ¶ 41 (noting that the cases being overruled had not "yet been cited or relied upon in subsequent appellate court decisions"), there is already a robust line of cases that have followed up on and interpreted *Alires*. We have relied meaningfully on *Alires* at least eight times. *See State v. Alarid*, 2022 UT App 84, ¶¶ 27–42, *petition for cert. filed*, July 27, 2022 (No. 20220660); *State v. Mottaghian*, 2022 UT App 8, ¶¶ 54–72, 504 P.3d 773; *State v. Baugh*, 2022 UT App 3, ¶¶ 13–25, 504 P.3d 171, *cert. granted*, July 11, 2022 (No. 20220272); *State v. Paule*, 2021 UT App 120, ¶¶ 37–48, 502 P.3d 1217, *cert. granted*, July 11, 2022 (No. 20220039); *State v. Mendoza*, 2021 UT App 79, ¶¶ 8–21, 496 P.3d 275; *State v. Gollaher*, 2020 UT App 131, ¶¶ 30–39, 474 P.3d 1018; *State v. Whytock*, 2020 UT App 107, ¶¶ 29–34, 469 P.3d 1150; *State v. Case*, 2020 UT App 81, ¶ 23, 467 P.3d 893. And we do not perceive that *Alires* is a poorly functioning precedent in practice, or that it is inconsistent with other governing legal principles. Indeed, the rapid development of a robust line of jury unanimity case law indicates emerging reliance by bench and bar

on the principles set out in *Alires*, and counsels against our overruling *Alires* now.

¶47 This conclusion is bolstered by our knowledge that our supreme court—although it did not grant certiorari review in *Alires* itself—has recently granted certiorari review in both *Paule* and *Baugh*, two of our cases that have followed (and favorably cited) *Alires*. In *Baugh*, the petition was specifically granted as to the following issue: "Whether the Court of Appeals erred in concluding [that] Petitioner's counsel was ineffective in failing to ensure [that] the jury was instructed that all of its members were required to agree on a particular alleged incident of sexual contact to justify any conviction for a count of aggravated sexual abuse of a child." *Order*, July 11, 2022 (No. 20220272). As noted above, in our appellate system, it is our supreme court—rather than some iteration of this court—that possesses primary responsibility for reviewing the propriety of opinions rendered by panels of this court. The fact that our supreme court has now apparently taken this issue on makes us even more reluctant to step in and revisit *Alires* at this point.

¶48 For these reasons, the State's request that we partially overrule *Alires* runs aground on the second step of the *Eldridge* test. In our view, *Alires* has shown itself to be a workable precedent that has lent itself well to a consistent, developing line of cases upon which bench and bar have begun to rely. And our supreme court will likely soon tell us if we were on the right track in *Alires*. Under these circumstances, we deem it improvident to revisit *Alires* at this point, and on that basis we decline the State's invitation to partially overrule it.

C

¶49 Finally, we must examine the question of whether counsel's deficient performance prejudiced Garcia-Lorenzo. An attorney's failure to seek a specific jury unanimity instruction is

not always prejudicial; indeed, we have rejected ineffective assistance claims on prejudice grounds in two types of jury unanimity cases. In some such cases, we have concluded that the State made clear, in closing argument or elsewhere, which act went with each count, and therefore a specific instruction on jury unanimity would not have changed the outcome of the case. *See, e.g., State v. Paule*, 2021 UT App 120, ¶ 48, 502 P.3d 1217 (holding that prosecutors had taken steps "to obviate any jury unanimity problem" when they "clearly identified for the jury which factual circumstance formed the basis for [the] obstruction of justice charge"), *cert. granted*, July 11, 2022 (No. 20220039); *cf. State v. Mendoza*, 2021 UT App 79, ¶ 19, 496 P.3d 275 (stating that, had the prosecutor "put[] all his eggs in one basket and argu[ed] that the jury should unanimously determine that [the defendant] committed any one particular action," it might not have concluded that prejudice existed).

¶50 In other such cases, we have concluded that, for various case-specific reasons, the outcome of the case would not have changed had the jury been given a specific jury unanimity instruction. *See, e.g., State v. Mottaghian*, 2022 UT App 8, ¶ 66, 504 P.3d 773 (concluding that, "when the defendant does not dispute that the relevant acts . . . occurred, and there is no meaningful and relevant basis upon which to distinguish the various acts underlying the charges, the absence of a jury unanimity instruction ultimately does not prejudice the defendant because the jury would have had no difficulty in unanimously agreeing that any one of the relevant criminal acts supported the charges"); *accord State v. Case*, 2020 UT App 81, ¶ 26, 467 P.3d 893; *State v. Percival*, 2020 UT App 75, ¶¶ 29, 33–34, 464 P.3d 1184.

¶51 In this case, the State asserts that, for two reasons, the lack of a specific unanimity instruction was not prejudicial here. First, with regard to the sodomy count, the State contends that it took steps to obviate any jury unanimity problem by asking the jury, during closing argument, "to convict based on only one act" of

sodomy. Second, with regard to the aggravated sexual abuse count, the State contends that, given the evidence in this case—the bulk of which was centered around the event which occurred on New Year's Eve—"there is no reasonable likelihood that the jurors would have been unable" to "agree as to which act occurred." Neither of these arguments is sufficiently supported by the record.

¶52 Our review of the State's closing argument reveals that the prosecutor fell short of sufficiently and clearly instructing the jury regarding which act corresponded with the sodomy count. The State points to the following remark—made by the prosecutor near the beginning of her closing argument—as potentially curative of any unanimity issue on that count:

> So with [the sodomy] charge we are asking you to find the defendant guilty because of [Child's] statement that after the date in which her mother discovered what was happening, she said that this happened before. And she told you that this happened before when they lived in the other house.

But this statement resolved nothing for the jury. As opposed to clearly identifying which act "formed the basis for" the charge, *see Paule*, 2021 UT App 120, ¶ 48, this statement made reference to both asserted acts of sodomy. As Garcia-Lorenzo correctly asserts, it is entirely possible (and perhaps even likely) that the jury simply understood the prosecutor to be saying that, because the sodomy allegedly happened on multiple occasions, it was *more likely* to have also happened on New Year's Eve. And this interpretation makes the most sense given the language of the charging document and given the way in which the evidence came in at trial: the charging document left open the possibility that the charged sodomy could have occurred on New Year's Eve, and the bulk of the sodomy evidence presented at trial was

unquestionably focused on the events of New Year's Eve, when Mother walked in on Garcia-Lorenzo and Child.

¶53 Thus, the State's closing argument did not—or, at least, not clearly enough—identify for the jury which factual circumstance or act served as the underlying offense for the sodomy charge. We are not persuaded that, on this record, the State's closing argument sufficiently obviated the problem created by the absence of a specific jury unanimity instruction.

¶54 Next, this is not a case in which "there is no meaningful and relevant basis upon which to distinguish the various acts underlying" the aggravated sexual abuse charges. *See Mottaghian*, 2022 UT App 8, ¶ 66; *see also Case*, 2020 UT App 81, ¶ 26 (concluding that, because a defendant charged with seven counts had stipulated that his laptop contained thirty-seven images of child pornography, the fact that no specific unanimity instruction was given was not prejudicial because "there is little doubt the jury would have selected the seven most sexually graphic depictions of child pornography among the thirty-seven that were admitted into evidence"). As an initial matter, Garcia-Lorenzo—unlike the defendant in *Mottaghian*—denies that he committed the acts in question. *See Mottaghian*, 2022 UT App 8, ¶ 61. Here, the possibility remained, due to the contested nature of the acts in question, that the jury might determine that only some—but not all—of the alleged acts had actually taken place.

¶55 And more importantly, in this case—unlike the situation in *Case*, *see* 2020 UT App 81, ¶ 26 (determining that, given the defendant's stipulation that all thirty-seven of the images in question "constituted child pornography," once the jury determined that he had possessed the images there was no basis for distinguishing between them)—there existed a reasonable basis in the evidence for jurors to disagree on whether all of the alleged acts of aggravated sexual abuse occurred. Not only did Child acknowledge, on cross-examination, that she had been

telling the truth when she told Garcia-Lorenzo that Mother had told her what to say and that "if [she] didn't say what [Mother] had told [her] to say, that [she] would get in trouble," but she gave conflicting accounts about exactly what happened on New Year's Eve. In the police interview, the detective asked Child if Garcia-Lorenzo had touched any body part other than her "butt," and Child said "no." But at trial, using an anatomical drawing, Child indicated that Garcia-Lorenzo touched her that morning with his penis "on" both her vagina and her anus. The prosecutor, during closing argument, did little to clear up the situation, asserting that Garcia-Lorenzo "touched both of those places on [Child's] body on that last event," without specifying which touch formed the basis for the aggravated sexual abuse charge.

¶56 Furthermore, as Garcia-Lorenzo points out, one of the acts alleged—the assertion that Garcia-Lorenzo touched Child's anus with his penis—could have qualified as *either* sodomy or aggravated sexual abuse. The jury was instructed that "sodomy" constituted "a sexual act . . . [i]nvolving the genitals of [Garcia-Lorenzo] and the anus of [Child]," and that "aggravated sexual abuse" constituted the act of "touch[ing] the anus, buttocks, or genitals of" Child. And no instruction told the jury that the two convictions had to be for different acts. *See State v. Sanchez*, 2015 UT App 27, ¶ 19, 344 P.3d 191; *see also State v. Lopez*, 2004 UT App 410, ¶ 8, 103 P.3d 153 ("Courts apply the merger doctrine as one means of alleviating the concern of double jeopardy that a defendant should not be punished twice for the same crime.").

¶57 For these reasons, we remain unpersuaded by the State's arguments. In our view, there is at least a reasonable probability, on the record before us, that the absence of a specific jury unanimity instruction made a difference in the outcome of the case. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). Accordingly, Garcia-Lorenzo has demonstrated *Strickland* prejudice and has therefore demonstrated that his attorney

rendered ineffective assistance by failing to seek a specific jury unanimity instruction. On this basis alone, we reverse his convictions and remand this case to the district court for a new trial or such other proceedings as may now be appropriate.

## II. Guidance on Other Issues

¶58 Because we have concluded that Garcia-Lorenzo is entitled to a new trial due to ineffective assistance of counsel, we could end our analysis here. But Garcia-Lorenzo has raised, and the parties have briefed, other issues that may arise on remand, and "in an effort to offer guidance that might be useful on remand, where these issues are likely to arise again," we elect to briefly discuss two of Garcia-Lorenzo's other arguments. *See State v. Valdez*, 2021 UT App 13, ¶ 54, 482 P.3d 861, *cert. granted*, 469 P.3d 715 (Utah 2021); *see also State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (reversing on other grounds and remanding for a new trial, but nevertheless proceeding to comment on "other issues presented on appeal that will likely arise during retrial").

### A

¶59 First, we discuss Garcia-Lorenzo's contention that the trial court failed to appropriately remedy asserted prosecutorial misconduct related to statements made during the State's closing argument. Here, Garcia-Lorenzo contends that the prosecutor committed misconduct by making statements that implied that defense counsel had acted inappropriately by asking leading questions while cross-examining Child.

¶60 We note at the outset that, when considering an appellant's assertion that he was harmed by prosecutorial misconduct, we "review the decision[] of [the] lower court[]," and "[w]e do not review the actions of counsel—at least not directly." *See State v. Hummel*, 2017 UT 19, ¶ 107, 393 P.3d 314. The particular decisions of the trial court that Garcia-Lorenzo assails are its decisions to

overrule his objection to the prosecutor's statements during closing argument, and to deny his post-trial motion.

¶61 Given our conclusion regarding ineffective assistance of counsel, we need not reach the question of whether the trial court, under the circumstances, acted inappropriately in either of these particulars, or whether the trial court's actions—if error—were sufficiently prejudicial to warrant a new trial. But in any event, we are generally concerned with the State's implication that asking leading questions on cross-examination, even when the witness is a child, is somehow inappropriate or constitutes improper "pressuring" of a child witness. Asking leading questions on cross-examination is a perfectly acceptable trial tool, generally available to all parties, and this holds true even when the witness in question is a child. *See* Utah R. Evid. 611(c)(1) (stating that "[o]rdinarily, the court should allow leading questions . . . on cross-examination"); *see also Securities & Exch. Comm'n v. Goldstone*, 317 F.R.D. 147, 163 (D.N.M. 2016) (stating that the corresponding federal rule of evidence "reflects the more general principle that "leading questions are usually permissible on cross-examination and impermissible on direct examination" (quotation simplified)). Indeed, even the prosecution is sometimes allowed, under the careful supervision of the trial court, to put leading questions to child witnesses during *direct* examination. *See State v. Kallin*, 877 P.2d 138, 144 (Utah 1994) (holding, in that particular case, that asking leading questions of a child witness was "not inappropriate" even during *direct* examination by the prosecutor, and stating that "[l]eading questions may be necessary to develop the testimony of a child, especially one who is testifying about a sensitive and embarrassing subject"); *State v. Isom*, 2015 UT App 160, ¶¶ 67–68, 354 P.3d 791 (similar holding). If a particular leading question is objectionable on other grounds (e.g., argumentative), a specific objection can be lodged. But it is improper for the State to generally imply—through expert testimony on techniques for forensic interviews of children, or otherwise—that defense

counsel acts inappropriately by asking leading questions of a child witness during cross-examination.

¶62   And we are unpersuaded that defense counsel—simply by arguing that Child had been pressured by Mother to make the allegations she made—opened the door for the State to make that implication. In this case, defense counsel had an evidentiary basis to argue that Child had been pressured: after all, Child testified, at both trials, that she had told Garcia-Lorenzo that Mother had pressured her.

¶63   On remand, we encourage the State to refrain from implying that defense counsel acts inappropriately by asking leading questions during cross-examination, and we expect the trial court to take appropriate action, upon objection, if the issue arises again.

B

¶64   Finally, we elect to briefly discuss Garcia-Lorenzo's contention that the trial court erred when it prevented Garcia-Lorenzo's brother's ex-girlfriend from offering her lay opinion that the "moaning" she heard coming from Garcia-Lorenzo and Mother's room on New Year's Eve after the party sounded as if the two were engaging in sexual activity.

¶65   Under our evidentiary rules, a witness may offer a lay opinion if that opinion is (a) "rationally based on the witness's perception"; (b) "helpful to . . . determining a fact in issue"; and (c) "not based on scientific, technical, or other specialized knowledge." *See* Utah R. Evid. 701. The first two requirements are clearly met here: the opinion is based on the witness's perception—she heard the sounds herself—and it is helpful to the determination of a fact at issue—whether, and to what extent, Mother was upset with Garcia-Lorenzo on New Year's Eve.

¶66 And we think the third requirement is met here too. That requirement is met where the testimony concerns knowledge "within the ken of the average bystander." *See State v. Rothlisberger*, 2006 UT 49, ¶ 34, 147 P.3d 1176; *see also State v. Hulse*, 2019 UT App 105, ¶ 32, 444 P.3d 1158. Utah appellate courts have held that things like "whether a person is intoxicated" and how fresh a wound is are within the ken of the average bystander. *See Hulse*, 2019 UT App 105, ¶ 35 (freshness of wounds); *State v. Sellers*, 2011 UT App 38, ¶ 26, 248 P.3d 70 (level of intoxication). And other courts, interpreting the federal version of rule 701, have allowed lay witnesses to offer opinions about the nature of sounds they heard. *See, e.g.*, *United States v. Card*, 86 F. Supp. 2d 1115, 1116 (D. Utah 2000) (allowing lay witnesses to offer an opinion "that a perpetrator of [certain] robberies 'talked like' . . . an African-American"); *E.E.O.C. v. Caterpillar*, No. 03 C 5637, 2004 WL 2092003, at *2 (N.D. Ill. Sept. 14, 2004) (allowing lay witnesses to offer an opinion that coworkers had "whistled at them as if they were dogs"). Certainly, not every person has experience differentiating sober people from intoxicated people. But most people do. And where most people have sufficient experience with a subject, a lay opinion on that subject is by definition "within the ken of the average bystander," *see Rothlisberger*, 2006 UT 49, ¶ 34, and therefore not based on "scientific, technical, or other specialized knowledge," *see* Utah R. Evid. 701(c).

¶67 Similarly, not every person has experience sufficient to distinguish between moans of sexual pleasure and other types of moans. But most adults do. Accordingly, the trial court should have allowed the lay witness in this case to testify about whether, in her opinion, the moans sounded like sexual activity, subject, of course, to cross-examination about the basis for the opinion. Thus, if Garcia-Lorenzo, on remand, seeks to introduce this testimony, the trial court should not exclude it solely on the basis that it is, as a general matter, not the proper subject of lay opinion testimony.

CONCLUSION

¶68     In this case, where Garcia-Lorenzo was charged with only two counts—one for sodomy and one for aggravated sexual abuse—but the State put on evidence of four potentially criminal acts, jurors should have been provided with an instruction specifically telling them that they needed to unanimously agree as to the specific acts supporting each count of conviction. Under *Alires*, trial counsel acted unreasonably by failing to seek such an instruction, and the absence of that instruction was prejudicial. We decline the State's invitation to partially overrule or disavow *Alires*. Accordingly, Garcia-Lorenzo has demonstrated that his attorney rendered ineffective assistance. On that basis, we reverse Garcia-Lorenzo's convictions and remand the case for further proceedings, including potentially a new trial.

————————